**Reversed and Rendered in Part and Remanded in Part and Opinion filed March 26, 2015.**



In the

# Fourteenth Court of Appeals

---

### NO. 14-13-00884-CV

---

### CONOCOPHILLIPS COMPANY, Appellant

### V.

### NOBLE ENERGY, INC., Appellee

---

**On Appeal from the 113th District Court
Harris County, Texas
Trial Court Cause No. 2011-46437A**

---

### O P I N I O N

This case primarily concerns whether appellee Noble Energy, Inc.,[1] owes indemnification to appellant ConocoPhillips Company for underlying environmental claims based on a 1994 Exchange Agreement and Assignment and Bill of Sale

---

[1] Unless otherwise indicated, when we refer to "Noble," we are referring to the appellee corporation.

involving the exchange of oil and gas assets in Louisiana. After ConocoPhillips filed suit against Noble for declaratory judgment, and for breach of contract based on the failure to defend and indemnify and to perform other obligations, ConocoPhillips and Noble filed competing motions for summary judgment. The trial court permitted Noble to withdraw certain admissions and ultimately granted summary judgment in favor of Noble, finding as a matter of law that Noble was not a party to, did not assume and was not assigned, and otherwise had no obligation under the Exchange Agreement and assignment.

We conclude that the trial court did not abuse its discretion in permitting Noble to withdraw its admissions. However, we conclude that the Exchange Agreement constitutes an executory contract, assumed by the debtor/seller Alma Energy Corp. and assigned during chapter 11 bankruptcy proceedings and pursuant to a 2000 Asset Purchase and Sale Agreement to buyer East River Energy L.L.C./Elysium Energy, L.L.C. We also conclude that Elysium was a wholly owned subsidiary of Patina Oil & Gas Corporation and Noble Energy Production, Inc., as a wholly owned subsidiary of Noble Energy, Inc., merged with Patina. Therefore, the trial court erred in refusing to grant partial summary judgment in favor of ConocoPhillips and in granting summary judgment in favor of Noble. We reverse the trial court's final judgment, render judgment that Noble owes ConocoPhillips a duty of defense and indemnity, and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The underlying lawsuit concerns alleged environmental damage to the Johnson Bayou oil and gas field in Cameron Parish, Louisiana, which has been operated as a unitized lease since approximately 1964. One of the operators of the Johnson Bayou field was General American, a predecessor to ConocoPhillips.

In 1994, Phillips Petroleum Company, another predecessor to ConocoPhillips,

2

entered into an Exchange Agreement by which Phillips agreed to effect the transfer of certain Louisiana assets, including its interests in the Johnson Bayou field, to Alma and Texas Petroleum Investment Company (TPIC). In return, Alma and TPIC agreed to effect the transfer of certain other Louisiana assets to Phillips.

At closing, Phillips became the assignee of the Alma/TPIC leases and Alma/TPIC became the assignee of the Phillips leases, including Johnson Bayou. Under part VII of the Exchange Agreement, each assignee agreed to indemnify each assignor for all claims arising out of waste materials or hazardous substances on the exchanged leases, whether or not attributable to the assignor's actions, "prior to, during or after the period of" the assignor's ownership. Each assignee also agreed to comply with laws and regulations relating to abandonment of wells or the leasehold property, and indemnify each assignor for related liabilities. Under part IX of the Exchange Agreement, each assignee agreed to indemnify each assignor for all claims, including clean-up or plugging liabilities for wells, "on account of any . . . damage, destruction or loss of property, contamination of natural resources (including soil, air, surface water, or ground water) resulting from or arising out of . . . or connected with the presence, disposal or release of any material of any kind . . . in, under, or on the Assets," at the time of the assignment or thereafter, and whether or not caused by the assignor. All indemnities were to survive closing and the transfer of the leases.

Additionally, in the Exchange Agreement, Alma/TPIC reserved and excepted from its assignment to Phillips "a production payment equal to a net 1.15% of 8/8ths in the Lake Washington," Louisiana, leases. The "production payment" was to run for 17 years from January 1, 1994. The parties then entered into an Assignment and Bill of Sale, made subject to the Exchange Agreement. This assignment included indemnity language virtually identical to that from the Exchange Agreement. For the next five years, Alma and its operating affiliate Equinox Oil Company, Inc., operated the Johnson

3

Bayou field. Phillips issued production payments to Alma on its retained interest in the Lake Washington leases conveyed to Phillips.

On June 10, 1999, Alma and Equinox filed for chapter 11 bankruptcy. During the bankruptcy proceeding, by auction sale, Alma and Equinox sold their assets to East River pursuant to an Asset Purchase and Sale Agreement entered into May 3, 2000. The seller companies Alma and Equinox agreed to sell and the buyer East River agreed to purchase all of the seller companies' "rights and interests in and to all contracts, agreements, purchase orders, real property, real estate leases, and personal property leases in any way associated with" the seller companies' assets, including but not limited to material contracts listed on an exhibit. East River only agreed to assume the seller companies' liability for the Assumed Liabilities and Assumed Obligations. East River's "Assumed Obligations" included "perform[ing] obligations under any executory contracts or unexpired oil and gas leases expressly assumed hereunder." These assumed obligations were to survive the closing.

The debtors' chapter 11 reorganization plan defines "Executory Contract" as "collectively, 'executory contracts' and 'unexpired leases' of the Debtors as of the Petition Date as such terms are used within section 365 of the Bankruptcy Code." The plan provides that all of the debtors' interests in any oil and gas leases "to the extent such leases are Executory Contracts, shall be assumed and assigned to" East River. The plan further provided that "any Executory Contract or lease not referenced above shall be assumed and assigned" to East River. The plan stated that agreements to be rejected by the debtors were listed in an exhibit to the disclosure statement. East River was to notify the debtors "of any leases or executory contracts" not listed in the exhibit that "East River elect[ed] not to have assumed and assigned to it by" the debtors. In addition, all leases or executory contracts not rejected or the subject of a motion to reject, listed on the exhibit, or on the list provided by East River to the debtors "shall be

4

assumed by the Debtors and assigned to East River."[2]

The bankruptcy court approved the plan by order in August 2000. The order provided that except for contracts and agreements already assumed or rejected, "those Executory Contracts and Unexpired Leases proposed to be assumed and assigned to East River . . . pursuant to the Plan are ordered assumed and assigned to East River." The order stated that executory contracts and unexpired leases proposed to be rejected pursuant to the plan and the section 365 notices are ordered rejected. The order further stated that East River has "provided adequate assurance of future performance of all Executory Contracts and Unexpired Leases being assumed and assigned to it."

After the bankruptcy court entered its order, East River changed its name to Elysium.[3] Alma and Elysium then executed an Assignment, Bill of Sale and Conveyance to accomplish the transfer of interests in the oil and gas properties. This assignment incorporated the Asset Purchase and Sale Agreement and the order confirming the plan. The assignment further stated it was "made with full substitution and subrogation of [Elysium] in and to all indemnifications . . . to the extent such substitution and subrogation may be made, otherwise, heretofore given or made with respect to the Interests."

In December 2003, Elysium entered into an Agreement of Purchase and Sale with Aspect Energy, LLC whereby Elysium sold its interest in the Johnson Bayou field to Aspect. Then Elysium and Azimuth Energy, LLC, a wholly owned subsidiary of

---

[2] This plan language is consistent with that contained in the disclosure statement. Also, the Asset Purchase and Sale Agreement expressly referenced the plan and stated that it "materially conforms to the terms and conditions of this Agreement." The Asset Purchase and Sale Agreement further provided that it "shall specifically be approved by the Bankruptcy Court and shall be incorporated as part of the Plan."

[3] Throughout the remainder of this opinion, we will reference Elysium with the understanding that East River was the named buyer entity involved in the bankruptcy sale.

Aspect, executed an Assignment and Bill of Sale to accomplish the transfer of interests.

In December 2004, Elysium's parent company Patina merged with Noble Energy Production. Under the merger, the surviving entity Noble Energy Production expressly assumed "all the obligations, duties, debts, and liabilities" of Patina.

In May 2010, the State of Louisiana and the Cameron Parish School Board filed suit in Cameron Parish district court, asserting several claims for environmental damage and contamination against ConocoPhillips and others, including Aspect and Azimuth, as current or former owners and operators of the Johnson Bayou field. ConocoPhillips made demands on both TPIC and Noble for defense and indemnity, but they each denied the demand.

In August 2011, ConocoPhillips filed suit against TPIC in Harris County district court, adding Noble as a defendant in May 2012. ConocoPhillips alleged that the defendants breached the defense and indemnity provisions in the Exchange Agreement and assignment, as well as provisions in the Exchange Agreement concerning environmental cleanup.[4] ConocoPhillips reached a settlement with the school board for $63 million, which the trial court approved.[5]

During discovery, ConocoPhillips sent Noble requests for admission, which Noble initially answered as follows:

**REQUEST FOR ADMISSION NO. 4:**

Admit that Alma transferred all of its rights and obligations stemming from the Assignment to Elysium in November 2000, as stated in paragraph 13 of Noble's Counterclaim filed in Great Northern Insurance Company and Federal Insurance Company v. Noble Energy Inc. and

---

[4] In January 2012, the trial court granted partial summary judgment in favor of ConocoPhillips and against TPIC, declaring that TPIC owed ConocoPhillips a duty to defend.

[5] The State of Louisiana dismissed its intervention in the underlying suit with prejudice.

ConocoPhillips Company, Civil Action No. 3:11-cv-3467-F, Northern District of Texas, Dallas division, attached as Exhibit B.

## RESPONSE TO REQUEST FOR ADMISSION NO. 4:

Noble objects to "Elysium" because it is vague and ambiguous. Subject to this objection Noble admits that Alma transferred all of its rights and obligations stemming from the Assignment to Elysium Energy LLC.

## REQUEST FOR ADMISSION NO. 5:

Admit that Noble is the successor to Elysium by merger, as admitted in paragraph 11 of Noble's Answer and Counterclaim to GNIC and Federal's Complaint for Declaratory Judgment in the lawsuit, Great Northern Insurance Company and Federal Insurance Company v. Noble Energy Inc. and ConocoPhillips Company, Civil Action No. 3:11-cv-3467-F, Northern District of Texas, Dallas division, attached as Exhibit B.

## RESPONSE TO REQUEST FOR ADMISSION NO. 5:

Noble objects to "Elysium" because it is vague and ambiguous. Subject to this objection, Noble admits that it is the successor by merger to Elysium Energy, LLC.

In August and November 2012, ConocoPhillips moved for partial[6] traditional summary judgment, seeking declarations that Noble owed ConocoPhillips defense and indemnity under the Exchange Agreement. ConocoPhillips argued: the Exchange Agreement and assignment transferred ConocoPhillips' interests in the Johnson Bayou field to Alma; Alma later transferred its rights and obligations to Elysium; Noble merged with Elysium and is its successor; the underlying lawsuit includes claims of environmental damage to Johnson Bayou field; the Exchange Agreement provides that Noble owes a duty to defend ConocoPhillips from claims arising from such

---

[6] ConocoPhillips' request was partial because it did not address its claims for breach of contract or damages.

7

environmental damage; and ConocoPhillips was potentially liable to the plaintiffs in the underlying suit.

Noble responded and filed its own traditional motion for summary judgment, arguing: Elysium purchased assets and only certain liabilities during Alma's bankruptcy sale so there was no privity of contract; the bankruptcy court discharged all claims and liabilities against both Alma and Elysium; Noble has never owed an interest in or operated the property and Elysium sold its interest a year before Noble's subsidiary merged with Elysium's parent; and the claims were filed a decade after the bankruptcy and several years after Elysium sold its interests.

ConocoPhillips responded, arguing: the Exchange Agreement was an executory contract assumed by Alma and assigned to Elysium during the bankruptcy proceeding; Noble admitted that Elysium assumed both the rights and obligations from the Exchange Agreement; Noble's bankruptcy arguments fail; Noble's actions demonstrate both an express and implied assumption of the Exchange Agreement obligations; under Texas law, a corporate merger does not extinguish pre-existing contractual duties; and Noble's discharge argument contradicts 20 years of the parties' performance under and substantial reliance on the Exchange Agreement.

Noble then moved for leave to withdraw and amend its admissions 4 and 5. According to Noble, ConocoPhillips misinterpreted Noble's admissions and all Noble admitted was that "the rights and obligations in the Cameron Leases (part of the assets sold as part of the bankruptcy sale) were transferred from Alma to Elysium," as opposed to any rights or obligations from the Exchange Agreement and assignment. Noble argued that ConocoPhillips would not be unduly prejudiced because it knew about the bankruptcy and that trial was not set until June 2013.

ConocoPhillips responded that Noble failed to meet the standard for withdrawing admissions and that its request was simply a matter of legal strategy, not a mistake, and

that ConocoPhillips would be unduly prejudiced and withdrawal would not serve legitimate discovery and the merits.

On December 10, 2012, the trial court[7] held a hearing on Noble's motion to withdraw and amend admissions, as well as on both parties' motions for summary judgment.[8] Later that same day, the trial court granted Noble's motion to withdraw and amend admissions. On December 11, Noble withdrew its admissions and replaced them with denials. Also on December 11, the trial court denied ConocoPhillips' motions for partial summary judgment. On December 31, the trial court signed an order granting Noble's motion for summary judgment. The court found "as a matter of law that Noble is not a party to, has not assumed or been assigned, and otherwise has no obligation, contractual or otherwise, under, related to, or arising out of the June 14, 1994 Exchange Agreement or the June 30, 1994 Assignment and Bill of Sale between Phillips Petroleum and Alma Energy, Inc. and Texas Petroleum Investment Company or the subject matter of those agreements."

Noble filed a motion to sever, and ConocoPhillips moved for reconsideration of the withdrawal and summary judgment decisions. The trial court[9] held a hearing on March 22, 2013. The court orally agreed to permit ConocoPhillips to conduct additional discovery. The parties filed dueling motions to compel and for a status conference to

---

[7] At the time, the Honorable John Donovan was the presiding judge of the 113th Judicial District Court. On January 1, 2013, Judge Donovan began serving as Justice, Place 8, on the Fourteenth Court of Appeals.

[8] According to ConocoPhillips, it requested the opportunity to gather and present additional evidence in the event the trial court granted Noble's motion to withdraw. According to Noble, ConocoPhillips did not seek additional discovery when Noble moved to withdraw. In any event, the record does not reflect that ConocoPhillips formally moved for a continuance or moved for leave to amend the summary judgment record.

[9] The interim judge presiding over this hearing was the Honorable Larry Weiman, of the 80th Judicial District Court.

vacate. The trial court[10] held a hearing on May 31, 2013. In June 2013, the trial court signed an order that Noble produce a corporate representative to give testimony and documents regarding (1) tax payments made per the Exchange Agreement; (2) Noble's operations on the Johnson Bayou Field property; and (3) Noble's cleanup of the tank battery following the bankruptcy order, as well as documents "under which the business of Elysium was acquired by or merged with Noble."

In July 2013, ConocoPhillips submitted supplemental briefing and summary judgment evidence. Noble objected and moved to strike the briefing and evidence. The trial court held a hearing on August 16, 2013, on Noble's motions to strike and to sever and ConocoPhillips' motion for reconsideration. The trial court signed an order on August 28 denying ConocoPhillips' motions to reconsider the summary judgment orders. That same day, the court also granted Noble's motion to sever, stating that the court's December 31, 2012 order granting Noble's summary judgment motion was final and appealable.

ConocoPhillips timely appealed the final judgment and all interlocutory orders that merged into it. On appeal, ConocoPhillips brings four issues: whether the trial court (1) abused its discretion in permitting Noble to withdraw its express admissions; (2) otherwise erred in denying ConocoPhillips' motion for partial summary judgment where the evidence conclusively established Noble's contractual indemnity obligation; and (3) erred in granting Noble's motion for summary judgment because ConocoPhillips conclusively proved that Noble's obligations were not discharged in bankruptcy or (4) where the evidence created a fact issue on the same.

---

[10] At the time, the Honorable Michael Landrum had been appointed judge of the 113th Judicial District Court.

10

## II.     ANALYSIS

**A. The trial court did not abuse its discretion in allowing Noble to withdraw its admissions.**

ConocoPhillips contends that the trial court abused its discretion in permitting Noble to withdraw its admissions 4 and 5.  We disagree.

A party may withdraw or amend an admission if: (a) the party shows good cause for the withdrawal or amendment, and (b) the court finds that the parties relying upon the responses and deemed admissions will not be unduly prejudiced and that the presentation of the merits of the action will be subserved by permitting the party to amend or withdraw the admission.  Tex. R. Civ. P. 198.3.  "Good cause is established by showing that the failure involved was an accident or mistake, not intentional or the result of conscious indifference."  *Wheeler v. Green*, 157 S.W.3d 439, 442 (Tex. 2005) (per curiam).  A trial court has broad discretion to permit or deny the withdrawal of admissions.  *See Stelly v. Papania*, 927 S.W.2d 620, 622 (Tex. 1996) (per curiam).  We only set aside the trial court's ruling if, after reviewing the entire record, it is clear that the court abused its discretion.  *Id.*

ConocoPhillips argues that Noble did not establish good cause because its admissions were not the result of mistake or inadvertence[11] where Noble made the same admissions consistently in letters to its insurer and in a counterclaim filed against its insurer, and cannot establish good cause by asserting it did not realize the implications of its admissions.  In addition, ConocoPhillips argues that it was unduly prejudiced by

---

[11] Specifically, ConocoPhillips argues that Noble's conduct does not fall within *Stelly*, where the movant testified he subsequently discovered a surveyor's report showing he did not own the property in issue, or *Jones v. State*, No. 03-96-00192-CV, 1998 WL 318969 (Tex. App.—Austin June 18, 1998, no pet.) (not designated for publication), where the movant explained it mistakenly admitted the gasoline blended stocks at issue as taxable gasoline but it had used the wrong statutory definition of gasoline.

the belated withdrawal and that the belated order permitting discovery did not cure such prejudice.[12]

Noble insists that the requested admissions are irrelevant because they involved legal questions as opposed to facts under rule 198.1.[13]  Further, Noble contends its admissions 4 and 5[14] were the result of an accident or mistake in that Noble only intended to admit that certain rights and obligations in the Johnson Bayou field were transferred through bankruptcy from Alma to Elysium, and once it realized ConocoPhillips' interpretation was different, i.e., that Noble was admitting "Elysium assumed all obligations under the Exchange Agreement and the Assignment," it promptly emailed counsel about the mistake[15] and then timely moved to amend.  Noble also argues that its withdrawal did not delay trial or significantly hamper ConocoPhillips' ability to prepare.

Keeping in mind that that "[t]he primary purpose of requests for admission is to simplify trials by eliminating matters about which there is no real controversy," *Peralta v. Durham*, 133 S.W.3d 339, 341 (Tex. App.—Dallas 2004, no pet.)[16]; that whether and

---

[12] ConocoPhillips relies on *Morgan v. Timmers Chevrolet, Inc.*, 1 S.W.3d 803 (Tex. App.—Houston [1st Dist.] 1999, pet. denied), where the court found undue prejudice in a premises defect case.  Unlike here, in *Morgan*, the defendant waited more than two years, after trial had already begun, to attempt withdrawal and the plaintiffs had entirely foregone other evidentiary avenues.  *Id.* at 806–07.

[13] *See Time Warner, Inc. v. Gonzalez*, 441 S.W.3d 661, 668 (Tex. App.—San Antonio 2014, pet. denied) ("Therefore, requests for admission are improper and ineffective when used to establish controverted issues that constitute the fundamental legal issues in a case."); *Elliott v. Newsom*, No. 01-07-00692-CV, 2009 WL 214551, at *2–3 (Tex. App.—Houston [1st Dist.] Jan. 29, 2009, no pet.) (mem. op.) (reversing summary judgment based on deemed admissions involving meaning of unambiguous contract).

[14] However, we note in its brief "Noble agrees that it is Elysium's successor for the purposes of this appeal."

[15] The record reflects that Noble contacted ConocoPhillips the day after ConocoPhillips filed its November 2012 motion for partial summary judgment, which relied on Noble's admissions.

[16] *See Stelly*, 927 S.W.2d at 622.

what, if any, obligations Elysium had assumed from Alma stemming from the Exchange Agreement was in dispute; and that "[e]ven a slight excuse will suffice, especially where delay or prejudice will not result against the opposing party," *Kheir v. Progressive Cnty. Mut. Ins. Co.*, No. 14-04-00694-CV, 2006 WL 1594031, at *5 (Tex. App.—Houston [14th Dist.] June 13, 2006, pet. denied) (mem. op.), we cannot conclude that the trial court committed a clear abuse of discretion by permitting Noble to withdraw its admissions.

We overrule ConocoPhillips' first issue.

## B. The trial court's summary judgment decisions

Because the remaining issues all relate to the trial court's decisions to grant summary judgment in favor of Noble and against ConocoPhillips, we consider them together.

### 1. Standard of review

When both parties move for summary judgment and a trial court grants one motion and denies the other, as here, we consider both sides' summary-judgment evidence, determine de novo all issues, and render the judgment the trial court should have rendered. *See Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) (subs. op.); *NuStar Energy, L.P. v. Diamond Offshore Co.*, 402 S.W.3d 461, 465 (Tex. App.—Houston [14th Dist.] 2013, no pet.). The movant is entitled to summary judgment when it demonstrates that no genuine issues of material facts exist and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). Evidence is conclusive if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). When deciding whether a fact issue exists, we accept all evidence favorable to the nonmovant and resolve any doubts in its favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.

13

2005); *Burroughs v. APS Int'l, Ltd.*, 93 S.W.3d 155, 159 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

## 2. Contract interpretation

The construction of an unambiguous contract presents a question of law subject to de novo review. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011); *Washington Square Fin., LLC v. RSL Funding, LLC*, 418 S.W.3d 761, 767 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Our primary concern in interpreting a contract is to ascertain and to give effect to the intentions of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We therefore give terms their plain and ordinary meaning unless the contract indicates that the parties intended a different meaning. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). We construe indemnity agreements under normal rules of contract construction. *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000). We examine and consider the entire writing in an effort to harmonize and give effect to all provisions of the contract, so that none will be rendered meaningless. *J.M. Davidson*, 128 S.W.3d at 229.

Whether a contract is ambiguous is a legal question for courts to decide. *Gulf Ins.*, 22 S.W.3d at 423; *see Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). "A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). A contract is not ambiguous simply because the parties advance conflicting interpretations. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). If the contract is subject to more than one reasonable interpretation after applying the pertinent rules of contract construction, then the contract is ambiguous and there is a fact issue regarding the parties' intent. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012); *J.M.*

*Davidson*, 128 S.W.3d at 229.  Here, neither party argues that the contracts at issue are ambiguous—each simply insists its respective interpretation is the correct one.

## C. The parties' competing positions on summary judgment

### 1.  The Asset Purchase and Sale Agreement

ConocoPhillips argues that even without Noble's admissions, it presented conclusive proof of Noble's duty to defend/indemnify.  According to ConocoPhillips, uncontroverted evidence shows Noble merged with Elysium and assumed all of Elysium's contractual obligations, which included the Exchange Agreement's indemnity obligation.  ConocoPhillips asserts the record conclusively establishes that Elysium purchased the Exchange Agreement from Alma's bankruptcy estate in 2000.

Under section 1.01(d) of the Asset Purchase and Sale Agreement, Elysium agreed to purchase:

> All of Seller Companies' rights and interests in and to all contracts, agreements, purchase orders, real property, real estate leases, and personal property leases in any way associated with the Assets, including but not limited to, those Material Contracts (as defined hereinafter) described on Exhibit "D"[17] hereto; and all of Seller Companies' claims and rights under all notes, evidences of indebtedness, and deposits; and all rights and claims to refunds and adjustments of any kind owned by Seller Companies.

ConocoPhillips asserts that the Exchange Agreement is a contract "associated" with the Johnson Bayou field Asset falling within section 1.01(d).  ConocoPhillips points out that the Asset Purchase and Sale Agreement did not exclude contracts involving vested assets and did not otherwise include the Exchange Agreement as an Excluded Asset in section 1.02[18] of the Asset Purchase and Sale Agreement.  ConocoPhillips further argues

---

[17] Exhibit D does not list the Exchange Agreement.

[18] Section 1.02, Excluded Assets, provides:

> The Parties hereto agree that the following items shall be excluded from the

(continued)

15

that it would not make sense for Elysium to be able to assume rights but not obligations under the contracts it was purchasing.

Noble responds that ConocoPhillips is wrong when it asserts that Elysium assumed the Exchange Agreement with Alma's liabilities. Although it maintains Elysium was not assigned the Exchange Agreement at all under the Asset Purchase and Sale Agreement, Noble contends that even if a party's rights under a contract are assigned, the assignee is not obligated to perform the assignor's obligations unless it expressly assumes them. Noble further insists that the plain language of the Asset Purchase and Sale Agreement is inconsistent with the interpretation that Elysium assumed Alma's obligations from the Exchange Agreement.

To the extent Noble argues a purchaser of assets does not necessarily automatically assume liabilities and obligations of the seller, we generally agree that may be the case in certain successor-liability contexts.[19] Moreover, in the context of

---

Assets conveyed to [Elysium] by Seller Companies hereunder (the "Excluded Assets"):

(a) Any Causes of Action (as such term is defined in the Plan) or other Assets that are assigned to the Unsecured Creditors or are released pursuant to the Plan;

(b) Any of the Assets [Elysium] elects not to acquire pursuant to 5.02(d); and

(c) Any of the Assets determined by [Elysium], as consented to by Seller Companies and the Bank Group in writing prior to Confirmation (as such term is defined under the Plan) of the Plan, which consent shall not be unreasonably withheld, delayed or conditioned, as having liabilities directly associated with such Assets which exceed the Allocated Value (as such term is defined hereinafter) for such Asset, provided, however, that the exclusion of such Asset cannot create an "Excess Liabilities Escrow Claim". As used in this Agreement, an "Excess Liabilities Escrow Claim" shall mean an administrative, priority or other claim against the Seller Companies which must be paid in cash on the Effective Date and which, together with all other claims to be paid from the Liabilities Escrow pursuant to Section 1.04(a), exceeds the funds in the Liabilities Escrow (except to the extent such amount may be increased pursuant to Sections 5.02(d) and 6.01(1)).

[19] *See C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 780 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (recognizing that in asset transfer, in context where Business Corporation Act applies, successor acquires assets of corporation without incurring any of grantor corporation's

(continued)

assignment of a contract, the assignee only can be held liable under the predecessor's contract if the assignee expressly or impliedly assumes the predecessor's contractual obligations. *See Jones v. Cooper Indus., Inc.*, 938 S.W.2d 118, 125–26 (Tex. App.—Houston [14th Dist.] 1996, writ denied); *see also NextEra Retail of Tex., LP v. Investors Warranty of Am., Inc.*, 418 S.W.3d 222, 226–27 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (discussing *Jones*).

Under the plain language of the Asset Purchase and Sale Agreement, presuming that the Exchange Agreement does fall within Elysium's agreement to purchase "rights and interests in and to all contracts" in section 1.01(d), this does not automatically mean Elysium also agreed to purchase all obligations and liabilities contained within the Exchange Agreement. This is particularly the case where the Asset Purchase and Sale Agreement in sections 1.04[20] and 8.03[21] includes express provisions detailing what

---

liabilities unless successor expressly assumes those liabilities); *Lockheed Martin Corp. v. Gordon*, 16 S.W.3d 127, 139 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) ("To impose liability for a predecessor's torts, the successor corporation must have expressly assumed liability." (citing same section of Business Corporation Act)); *see also E-Quest Mgmt., LLC v. Shaw*, 433 S.W.3d 18, 23–24 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (citing recodification within section 10.254 of Texas Business Organizations Code).

[20] Section 1.04, Assumed Liabilities, provides:

In consideration for the sale of the Assets, [Elysium] shall be responsible for the liabilities described in this Section 1.04 (collectively the "Assumed Liabilities") on the terms and conditions set forth below and elsewhere in this Agreement.

1.04(a) The Liabilities Escrow (as hereinafter defined) shall be used to satisfy and pay, any and all liabilities of the Debtors as set forth in the Plan as confirmed (as limited and modified thereunder), including, but not limited to:

(1) The amount of the Unsecured Creditors Reserve (as such term is defined in the Plan);

(2) The Podolsky Reserve (as such term is defined in the Plan);

(3) Administrative and priority claims as provided for in the Plan;

(4) Any and all liabilities, claims and/or costs, that are detailed in Exhibit "P" hereto, to cure defaults under those assumed executory contracts and unexpired leases (and hydrocarbon leases to the extent not treated as executory contracts

(continued)

17

and unexpired leases pursuant to the bankruptcy code) that are provided for in the Plan; and

(5) Any liability of the Seller Companies arising under any consent decree entered between Debtors and any State of Louisiana Regulatory Authority, the United States Environmental Protection Agency or the United States Department of Justice in relation to Equinox's operations in Lake Washington Field, Plaquemines Parish, Louisiana, as further described in Exhibit "M" hereto, provided however, any such assumption shall in no manner effect, release or relieve any obligation or claim with regard to any insurance carrier or coverage of Seller Companies with regard thereto;

Notwithstanding the foregoing, subject to Bankruptcy Court approval pursuant to the Confirmation Order (as such term is defined in the Plan), [Elysium], at its option and in its sole and absolute discretion, which option must be exercised prior to Confirmation as set forth in the Plan, may assume from Seller Companies at Closing some or all of the Assumed Liabilities described in this Section 1.04(a), in which case the cash amount of the Liabilities Escrow shall be reduced by the face amount, or such other amount as determined by the Bankruptcy Court, of all such Assumed Liabilities.

1.04(b) The following liabilities shall be assumed by [Elysium] and not paid from the Liabilities Escrow:

(1) As detailed in Exhibit "F" hereto, liabilities and claims associated with suspended royalty, working interests or related obligations;

(2) Any and all liabilities or claims associated with bonds, escrow agreements and deposit agreements to the extent they are assumed as part of the Assets and are to remain or are required to be in place subsequent to the Effective Date;

(3) Any and all liabilities or claims associated with the "Commodity Hedge Facility" created in favor of DnB and as described in Exhibit "E" hereto;

(4) Any and all liabilities, claims and/or costs, that are incurred on a current basis and have not yet been paid, in each case in the normal course of business of the Seller Companies prior to Closing; and

(5) Any and all liabilities or claims associated with the "DnB Letters of Credit." As used herein, the "DnB Letters of Credit" shall mean both (i) the Letter of Credit in the amount of $800,000.00 issued on October 5, 1995 by DnB for the benefit of Chevron U.S.A., Inc., as subsequently amended and extended pursuant to the terms thereof, and (ii) the Letter of Credit in the amount of $20,000.00 issued on October 1, 1996 by DnB for the benefit of the Woodlands Office Equities – 95 Ltd, as subsequently amended and extended pursuant to the terms thereof, provided the liability under either such Letter of Credit may not be increased prior to Closing without [Elysium's] prior written consent. The assumption of the DnB Letters of Credit by [Elysium] pursuant to this Agreement shall be on terms and conditions consented to by DnB, or in the

(continued)

Assumed Liabilities and Assumed Obligations Elysium was agreeing to assume. Further, section 1.06, Liabilities, of the Asset Purchase and Sale Agreement provides:

> Except for the Assumed Liabilities and Assumed Obligations (as such term is defined in Section 8.03 below) assumed pursuant to the terms and conditions hereof, [Elysium] is not assuming any liability of any of the Seller Companies, or related to the Assets of any kind or description whatsoever.

Inclusion of this section is consistent with the interpretation that a certain limited set of liabilities and obligations would be transferred to Elysium as part of the bankruptcy proceedings, pursuant to the Asset Purchase and Sale Agreement. Therefore, we cannot find summary judgment in favor of ConocoPhillips on the basis that section 1.01(d) acted to transfer both Alma's rights *and* obligations in the Exchange Agreement to Elysium.

---

event of failure to obtain such consent from DnB, the DnB Letters of Credit shall be replaced by [Elysium] on or prior to Closing;

1.04(c) The right at the sole option of [Elysium], to assume any and all liabilities or claims associated in any manner with insurance policies and bonds, for any coverage related to [Elysium's] operations subsequent to the Effective Date, provided however, that [Elysium] shall be obligated to assume or replace all bonding obligations required for the operation of Assets to be transferred to [Elysium] pursuant to this Agreement.

[21] In pertinent part, section 8.03, Buyer's Post-Closing Obligations, provides:

After Closing, [Elysium] shall have the following obligations ("Assumed Obligations"):

. . .

(b) . . . (iii) perform obligations under any executory contracts or unexpired oil and gas leases expressly assumed hereunder and (iv) to comply with any Consent Agreement and/or Decree entered between Seller Companies, the United States Environmental Protection Agency, United States Department of Justice and/or any Louisiana environmental authority, and to comply with any Environmental Laws (defined below) to the extent that any such obligation or liability is attributable to events or periods of time after the Effective Date. . . .

Such provision further required Elysium to return to Seller Companies after closing any money or property belonging to them; assume various obligations as owner of the assets arising after the closing date; and allow Seller Companies access to certain of their records.

## 2. Whether the Exchange Agreement was assumed and assigned as an executory contract

We must also determine whether the Exchange Agreement's obligations otherwise were expressly assumed by Elysium within the Asset Purchase and Sale Agreement. In making this determination, we remain mindful that the sale took place within the bankruptcy context. Therefore, we must determine whether the Exchange Agreement is an executory contract, whether Alma assumed the Exchange Agreement under section 365, and then whether it assigned its rights and obligations to Elysium. *See* 11 U.S.C. § 365(f)(2)(A) (2013); *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 253 (5th Cir. 2006) ("According to § 365(f)(2)(A), assumption must precede assignment."); *Compton v. Mustang Eng'g Ltd. (In re MPF Holding U.S. L.L.C.)*, 495 B.R. 303, 321 (Bankr. S.D. Tex. 2013) ("[S]ection 365 is the exclusive provision for dealing with executory contracts in bankruptcy.").

ConocoPhillips argues that under article X of the bankruptcy plan, executory contracts such as the Exchange Agreement were expressly assumed and assigned to Elysium. Sections 10.8 and 10.9 of the plan provide:

> 10.8 <u>Other Executory Contracts and Leases</u>. Subject to the approval of the purchaser under a consummated Auction Sale, or the Liquidating Trustee in the event no Auction Sale is consummated, any Executory Contract or lease not referenced above shall be assumed and assigned to the purchaser or Liquidating Trustee, as the case may be on the Effective Date. In the event not approved by the purchaser under a consummated Auction Sale, or as directed by the Liquidating Trustee in the event no Auction Sale is consummated, any such Executory Contract or lease shall be rejected on the Effective Date.

> 10.9 <u>Rejection of Contracts</u>. Exhibit "J" of the Disclosure Statement hereto reflects certain agreements, some of which may or may not be binding contracts and may or may not be Executory Contracts, which shall be rejected by the Debtors upon the Effective Date. By no later than July 28, [Elysium] shall notify the Debtors of any leases or executory contracts which are not set forth on Exhibit "J" and which [Elysium] elects not to

20

have assumed and assigned to it by the Debtors ("Contract Election Date"). All leases or executory contracts which are not (i) rejected or the subject of a motion to reject as of the Confirmation Hearing, (ii) on Exhibit "J" or (iii) on the list provided by [Elysium] to Debtors on or before the Contract Election Date pursuant to this section, shall be assumed by the Debtors and assigned to [Elysium].

ConocoPhillips asserts that the Exchange Agreement was not rejected or subject to a rejection motion as of the date of the confirmation hearing, was not listed in a particular exhibit to the disclosure statement, and was not expressly rejected by Elysium by the contract election date.

Based on the plain language of the plan,[22] we agree that the plan indicates that Alma was expressly assuming all executory contracts not otherwise rejected pursuant to a motion to reject, rejected as expressly listed by Alma in the disclosure statement, or rejected on the list as provided by Elysium. We also agree that the record here reflects that the Exchange Agreement was not the subject of a rejection motion, was not disclosed in exhibit J of the disclosure statement, and was not listed on Elysium's listing of executory contracts for rejection. We further note the bankruptcy court's confirmation order, paragraph 15, is consistent with this interpretation, providing that except for contracts and agreements already assumed or rejected, "those Executory Contracts and Unexpired Leases proposed to be assumed and assigned to [Elysium] . . . pursuant to the Plan are ordered assumed and assigned to [Elysium]." The order stated that executory contracts and unexpired leases proposed to be rejected pursuant to the plan and the section 365 notices are ordered rejected. The order also stated that Elysium has "provided adequate assurance of future performance of all Executory Contracts and Unexpired Leases being assumed and assigned to it."

---

[22] *See MPF Holding*, 495 B.R. at 316 (considering whether plain language of plan and order indicated that novation agreement at issue was assumed and assigned).

Noble contends that ConocoPhillips relies too heavily on the plan and insists that the Asset Purchase and Sale Agreement provides a different interpretation relating to assumption by Alma and assignment to Elysium. However, our review of the plain language of the Asset Purchase and Sale Agreement is consistent with the plan's language that Alma would assume all remaining executory contracts and leases and assign them to Elysium. Within the agreement in section 8.03(b), Elysium agreed that post-closing it "shall have" the following "Assumed Obligation"—to "perform obligations under any executory contracts or unexpired oil and gas leases expressly assumed hereunder." The Asset Purchase and Sale Agreement included section 1.03, which described the bankruptcy plan as "incorporating the terms and conditions as set forth in this Agreement," and article VI included conditions to closing, which stated that the plan "materially conforms to the terms and conditions of this Agreement" and that "this Agreement shall specifically be approved by the Bankruptcy Court and shall be incorporated as part of the Plan." In section 8.04(b), Alma agreed to be responsible post-closing for all claims and liabilities with respect to the assets accruing or relating to the times prior to the effective time, essentially the morning of closing, "[e]xcept for those matters expressly assumed by [Elysium]." And under section 8.09, the provisions of article VIII, including Elysium's assumed obligations, "shall survive the Closing."

Moreover, the indemnification provisions of the Asset Purchase and Sale Agreement can be harmonized with the interpretation that Alma assumed and assigned all remaining executory contracts to Elysium. Both Elysium and Alma in sections 8.05 and 8.06 agreed to indemnify the other from and against claims arising from or attributable to their respective periods of ownership and operation of the assets and any breaches of their respective "representations, warranties, covenants, or agreements hereunder." However, under section 8.05, Indemnification by Buyer, in addition, Elysium agreed to indemnify Alma from and against all claims arising from or

22

attributable to "THE ASSUMED OBLIGATIONS."  Therefore, we cannot agree with Noble that ConocoPhillips' interpretation of the Asset Purchase and Sale Agreement renders sections 8.04(b) and 8.06 meaningless.[23]

Having concluded the plain language of the Asset Purchase and Sale Agreement, and of the plan and the order, aligns with ConocoPhillips' interpretation that Alma assumed remaining executory contracts and any such executory contracts were assigned to Elysium as "assumed obligations," we proceed to determine whether the Exchange Agreement constitutes an executory contract within section 365 of the bankruptcy code. Based on our review of the governing law and of the agreement, we conclude that the answer is yes.

According to ConocoPhillips, the unperformed, remaining mutual indemnity obligations rendered the Exchange Agreement executory for the purposes of section 365 of the bankruptcy code.  In addition, ConocoPhillips insists the Exchange Agreement "contained many more remaining obligations than just the mutual indemnification obligations."[24]  ConocoPhillips primarily relies on *In re Safety-Kleen Corp.*, 410 B.R. 164, 167–68 (Bankr. D. Del. 2009), wherein the bankruptcy court concluded that a stock

---

[23] We do not find Noble's post-submission authority, *In re Allegheny Health, Education & Research Foundation*, 383 F.3d 169 (3d Cir. 2004), persuasive on the point that Elysium did not expressly assume obligations from executory contracts within the Asset Purchase and Sale Agreement. In contrast to *Allegheny*, *see id.* at 172, Elysium's assumed obligations did not turn on any temporal distinction, but rather the buyer Elysium after closing "shall" be responsible to "perform obligations under any executory contracts . . . expressly assumed hereunder," which reasonably can be harmonized with Elysium's agreement to indemnify the debtors from claims attributable to "the assumed obligations."  Further, Elysium's assumed obligations were to survive closing.

[24] In addition to the indemnity and environmental cleanup provisions within the Exchange Agreement, ConocoPhillips places much emphasis on Alma's 17-year-long reservation of production payments on the Lake Washington leases within the Exchange Agreement (and attempts to place much emphasis on alleged evidence of Elysium's and Noble's post-bankruptcy acceptance of payments from Phillips and later ConocoPhillips).  However, we note this payment obligation was one-sided and monetary in nature such that on its own it would be insufficient to render the Exchange Agreement executory.

purchase agreement involving some unperformed, remaining mutual indemnification obligations relating to certain environmental matters was an executory contract. *See also Philip Servs. Corp. v. Luntz (In re Philip Servs. (Del.), Inc.)*, 284 B.R. 541, 548–50 (Bankr. D. Del. 2002) (merger agreement imposed similar unperformed indemnification obligations on both parties, as well as remaining non-monetary obligations, and was executory).[25]

In contrast, Noble takes the position that the Exchange Agreement was not an executory contract.[26]   First, Noble points to cases indicating that contracts where the only remaining performance is monetary in nature are not executory, and where the courts have found contracts containing a continuing indemnification obligation nonexecutory. *See, e.g., In re Farmland Indus., Inc.*, 318 B.R. 159, 163 (Bankr. W.D. Mo. 2004); *In re Spectrum Info. Technologies, Inc.*, 190 B.R. 741, 748 (Bankr. E.D.N.Y. 1996); *In re Chateaugay Corp.*, 102 B.R. 335, 347 (Bankr. S.D.N.Y. 1989). Noble argues that, as in these cases, the Exchange Agreement was fully consummated and performed, except for future, contingent environmental liabilities.[27]

---

[25] ConocoPhillips also relies on *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1045–46 (4th Cir. 1985), wherein the Fourth Circuit concluded that a technology licensing agreement involving one party's unperformed, continuing obligations of notice and forbearance in licensing and contingent defense and indemnification obligations and the other party's unperformed, continuing obligations of accounting for and paying royalties, delivering sales reports and keeping accounting records, and keeping license technology in confidence rendered the contract executory as to both parties.

[26] Although Noble makes much of the fact that Phillips expressly moved the bankruptcy court to compel Alma and Equinox to assume or reject a particular processing agreement as an executory contract pursuant to section 365(d)(2), Noble acknowledges Phillips did not have to make any such request with regard to the Exchange Agreement for it to be assumed here.

[27] In addition, at argument and in post-submission briefing, Noble relies on *Lewis Brothers Bakeries Inc. v. Interstate Brands Corp. (In re Interstate Bakeries Corp.)*, 751 F.3d 955, 964 (8th Cir. 2014) (en banc), where the appellate court concluded that a license agreement pertaining to intellectual property was not executory in the larger context of a $20 million mainly-tangible asset sale.   In *Interstate Bakeries*, the bankruptcy court concluded that the remaining obligations of only *one* party were material. *Id.* at 963.   In reversing the district court, the court of appeals noted to conclude that a

(continued)

24

Pursuant to section 365, subject to the bankruptcy court's approval, any executory contract of the debtor may be assumed or rejected.  11 U.S.C. § 365(a) (2013); *see Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 504 (5th Cir. 2000) ("Under § 365, a debtor may elect one of two options when assessing how to treat an executory contract or unexpired lease to which it is a party; the contract or lease may either be rejected or assumed.").[28]  This provision allows a trustee to relieve the bankruptcy estate of a burdensome agreement that has not been completely performed.  *Phoenix Exploration, Inc. v. Yaquinto (In re Murexco Petroleum, Inc.)*, 15 F.3d 60, 62 (5th Cir. 1994) (per curiam).  The decision whether to assume or reject under section 365 is generally left to the business judgment of the bankruptcy estate.  *See Mirant Corp. v. Potomac Electric Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 524 n.5 (5th Cir. 2004).

Although the bankruptcy code does not define "executory contract," "[c]ourts applying § 365(a) have indicated that an agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party."

contract is executory under section 365, the bankruptcy court must find that "*both* parties have so far underperformed that a failure of *either* to complete performance would constitute a material breach excusing the performance of the other."  *Id.* (citing *Kaler v. Craig (In re Craig)*, 144 F.3d 593, 596 (8th Cir. 1998), and emphases in original).  The court of appeals determined that the contract at issue in *Interstate Bakeries* was not executory because the other party had substantially performed and its remaining obligations did not relate to the purpose of the agreement:  they concerned only one of the assets included in the sale.  751 F.3d at 963–64.  In other words, the appellate court determined there were no remaining mutual, material obligations between the parties.  In contrast, here, as explained *infra*, Alma and Phillips had mutual, material obligations the nonperformance of which would have resulted in a material breach of the Exchange Agreement at the time that Alma filed its bankruptcy petition.

[28] When an executory contract is rejected under section 365 of the bankruptcy code, it is treated as if the contract had been breached immediately before the date of the bankruptcy petition's filing; any claim arising from that breach is therefore a prepetition claim.  *See* 11 U.S.C. §§ 365(g)(1), 502(g) (2013).  An executory contract may not be assumed if there has been a default, unless such default is cured at the time of assumption.  *See id.* § 365(b).

*Murexco Petroleum*, 15 F.3d at 62–63 & n.8 (noting that source of this definition "is a two-part article by Professor Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 458–62 (1973), and *Executory Contracts in Bankruptcy: Part II*, 57 Minn. L. Rev. 479 (1974)"); *see Potomac Electric*, 378 F.3d at 518 n.3 ("Section 365(a) does not define executory contract, but the legislative history of that section indicates that the term means a contract 'on which performance is due to some extent on both sides.'").[29]  "Whether an obligation is material is tested at the time of the filing of the bankruptcy petition."  *Safety-Kleen*, 410 B.R. at 167; *see Murexco Petroleum*, 15 F.3d at 62.  Therefore, to determine if the Exchange Agreement was executory at the time that Alma filed its bankruptcy petition, we must consider whether Alma and Phillips had duties the nonperformance of which would have constituted a material breach of the Exchange Agreement at the time of the filing of the petition.  *See Murexco Petroleum*, 15 F.3d at 62–63.

Contingent material obligations are sufficient to render a contract executory. *Safety-Kleen*, 410 B.R. at 168.  That is, a contingent material obligation, even though not yet triggered on a debtor's petition date, is nevertheless executory until expiration of the contingency because "[u]ntil the time has expired during which an event triggering a contingent duty may occur, the contingent obligation represents a continuing duty to stand ready to perform if the contingency occurs."  *Richmond Metal*, 756 F.2d at 1046. Further, it is well-settled that an executory contract cannot be assumed in part and rejected in part.  *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (per curiam).  That is, "[w]here the debtor assumes an executory contract, it must assume the entire contract, *cum onere*—the debtor accepts

---

[29] Essentially, both ConocoPhillips and Noble agree that the Countryman definition of an executory contract is applicable here. *See In re Tex. Wyo. Drilling, Inc.*, 486 B.R. 746, 754 (Bankr. N.D. Tex. 2013) (noting that Fifth Circuit has adopted Countryman definition).

both the obligations and the benefits of the executory contract." *Century Indem.*, 208 F.3d at 506.

We find *Safety-Kleen* and *Philip Services*, bankruptcy court opinions which both applied the Countryman definition of executory contract, to be particularly instructive. The *Safety-Kleen* court considered the pertinent indemnity section of the stock purchase contract at issue, which provided that "subject to a certain dollar limit, Westinghouse and Rollins each held contingent, unliquidated rights of indemnification against the other with respect to any and all damages arising from pre-and-post-closing environmental matters, including contamination relating to the Coffeyville Facility." 410 B.R. at 166. After acknowledging that "a contract is executory if both parties have unperformed obligations that, if not completed, would result in a material breach," *id.* at 167, and considering that "[c]ourts have ruled that contingent obligations under a contract are sufficient to render a contract executory when the contingent obligations are essential to the contract," *id.* at 168, the court concluded that the indemnity provisions of the stock purchase agreement at issue were material and the agreement was an executory contract at the time of the debtors' filing for bankruptcy, *id.* at 169–70. In doing so, the *Safety-Kleen* court noted how the indemnity provisions provided benefits and burdens to both parties that continued at the time of the debtors' filing for bankruptcy: "Stated succinctly, the indemnity provisions were not nullities." *Id.* at 169.

Likewise, in *Philip Services*, the bankruptcy court considered whether a merger agreement was executory for purposes of section 365. 284 B.R. at 547. The dispute centered over whether additional material obligations remained due from both parties. *Id.* In concluding that the contract was executory, the bankruptcy court considered that one party remained obligated to perform environmental remediation duties associated with the properties and that the other party remained obligated for ongoing environmental compliance at certain contaminated sites. *Id.* at 547–48. In addition,

27

under the agreement, there were similar, continuing, largely unperformed indemnification obligations remaining as to both parties. *Id.* at 548–49. The court rejected the argument that the merger agreement was "not an executory contract because the unperformed indemnification obligations are not material," distinguishing *Chateaugay Corp.* and similar cases "where one party has completed performance, . . . or where the only performance that remains is the payment of money." *Philip Servs.*, 284 B.R. at 549 (quoting *Chateaugay Corp.*, 102 B.R. at 348) (emphasis omitted). In contrast to such cases, the court noted how "neither side has completed performance and both sides have monetary and non-monetary obligations remaining." *Id.* at 549. Although the court acknowledged that the merger agreement had a principal purpose of the sale of the corporation and its assets, it concluded that the future mutual obligations, including "the promise to indemnify," were "substantial element[s] of the overall transaction." *Id.* at 550 (discussing *Waldschmidt v. Metro. Lincoln-Mercury, Inc. (In re Preston)*, 53 B.R. 589, 591 (Bankr. M.D. Tenn. 1985)); *see also In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (citing *Safety-Kleen*, 410 B.R. at 168, and *Philip Servs.*, 284 B.R. at 549–50, and concluding that mutual continuing indemnity obligations for environmental damage caused by mill operation were material and call agreement containing them was executory).

Unlike the cases cited by Noble,[30] the Exchange Agreement here contains continuing, mutual, future, largely unperformed, material obligations, both monetary

---

[30] In *Farmland Industries*, the indemnification obligation at issue was one-sided and there were no outstanding mutual obligations. 318 B.R. at 163. The former employer's remaining obligation to defend and indemnify and make termination payments at issue in *Spectrum Information Technologies* likewise only involved monetary payment and was one-sided, while the former employee's remaining obligations of confidentiality and noninterference were not material. 190 B.R. at 748 (concluding employment agreement was not executory). And in *Chateaugay Corp.*, the bankruptcy court distinguished cases in which there were mutual, continuing obligations and concluded that the indemnity obligation at issue was one-sided and the other side had no similar outstanding obligation. 102 B.R. at 348–49. These cases are inapposite to our analysis because, here, the Exchange

(continued)

and nonmonetary in nature. Both Alma and Phillips respectively agreed to defend and indemnify the other from and against all claims caused by or arising out of the presence, disposal, release, or threatened release of hazardous substances or waste before, during, or after ownership of the exchanged assets, and to defend and indemnify the other from and against all claims, including contamination of natural resources, resulting from or arising out of any liability caused by or connected with the presence, disposal, or release of any material in, under, or on the exchanged assets at the time of or after assignment. We take particular note of the reciprocal, mutual nature of these indemnity obligations. *See Wilson v. TXO Prod. Corp. (In re Wilson)*, 69 B.R. 960, 962 (Bankr. N.D. Tex. 1987) (noting how legislative history adopts "principle of mutuality" and holding operating agreements where both parties have continuing obligations were executory); *see also In re RoomStore, Inc.*, 473 B.R. 107, 115 (Bankr. E.D. Va. 2012) ("The dispositive distinction is that in this case there was a continuing obligation on each side."). Further, the Exchange Agreement expressly provides that these mutual indemnification obligations indefinitely survive closing and the transfer of the assets; in fact, the parties considered the indemnification obligations to be of such importance that, as noted above, they included these obligations in the assignment conveying the respective leases.

Moreover, both Alma and Phillips mutually agreed to take all future environmental disposal, cleanup, and remedial actions related to their respective exchanged assets. And, although we acknowledge the Exchange Agreement indicated within its recitals its purposes for Alma and Phillips to effect the transfer of their respective assets, we nonetheless conclude that the remaining mutual indemnification obligations, along with mutual responsibilities regarding environmental cleanup,

Agreement between Phillips and Alma contained ongoing mutual obligations that could expose either party to potentially costly hazardous waste clean-up costs.

29

constituted material obligations. *See Safety-Kleen*, 410 B.R. at 167–70; *Philip Servs.*, 284 B.R. at 549–50. These obligations were detailed in several places in the Exchange Agreement and were largely carried over into the Assignment and Bill of Sale conveying the property to Alma.[31]

In sum, at the time of the filing of the bankruptcy petition, the failure of either Alma or Phillips to complete performance of its mutual obligations would have constituted a material breach of the Exchange Agreement. *See Murexco Petroleum*, 15 F.3d at 62–63. Therefore, we conclude that the Exchange Agreement is an executory contract for purposes of section 365.

### 3. No remaining fact issues[32]

Having concluded that Alma assumed, and Elysium was assigned, the Exchange Agreement as an executory contract as part of the bankruptcy proceedings whereby

---

[31] The Assignment and Bill of Sale was filed of record in the Cameron Parish clerk's office.

[32] As recognized by Noble in its brief, its position rests on "[t]he key point . . . that neither East River nor Elysium ever assumed Alma's Exchange Agreement liability in the first place," essentially a privity-of-contract point.

Because we conclude the Exchange Agreement is an executory contract assumed by Alma, assigned to Elysium, and expressly assumed by Elysium as an obligation pursuant to the Asset Purchase and Sale Agreement and the bankruptcy proceedings, we necessarily reject Noble's defensive positions that Elysium took the bankruptcy assets of Alma "free and clear" and discharged of all claims. Elysium's, and subsequently Noble's, obligation is based on an express, not an "implicit," assumption of liability. *Contra New Nat'l Gypsum Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 219 F.3d 478, 487 (5th Cir. 2000). Nor, even if we accept Noble's position that Elysium as a nondebtor may be entitled to any discharge, do the general discharge provisions of the bankruptcy code appear to operate in the face of expressly assumed executory contracts. *See Century Indem.*, 208 F.3d at 503–04, 509. Typically, claims arising from the rejection, not the assumption, of an executory contract may be discharged by the confirmation of the plan. *See* 11 U.S.C. § 1141(d)(1)(A) (2013).

Because we conclude that the indemnification obligation was part of an executory contract assumed by Alma and assigned to Elysium within the bankruptcy, consistent with the plain language of the Asset Purchase and Sale Agreement, we need not address the parties' arguments regarding the characterization of any indemnification obligation as a so-called covenant running with the land. *See* Tex. R. App. P. 47.1.

Elysium purchased the assets of Alma through a bankruptcy order and plan confirming the Asset Purchase and Sale Agreement, we consider whether ConocoPhillips conclusively established Noble assumed all the rights and obligations of Patina as a matter of law.

In its brief, Noble acknowledges that "the link between Elysium and Noble" is "not materially in dispute" and "agrees that it is Elysium's successor for the purposes of this appeal." Nevertheless, despite Noble's withdrawn merger admission, and even without having to consider the propriety of whether to consider any evidence gathered and supplemented after the trial court rendered summary judgment, our review of the record evidence at the time of summary judgment submission confirms this fact. Therefore, we conclude that ConocoPhillips conclusively established as of December 15, 2004, Noble effected a merger with Patina, of which Elysium was a wholly-owned subsidiary, whereby "all the obligations, duties, debts and liabilities of [Patina] and [Noble Energy Production] shall be the obligations, duties, debts and liabilities of the Surviving Corporation"—Noble Energy Production—as expressly and plainly stated within the Agreement and Plan of Merger executed by Patina, Noble Energy, and Noble Energy Production.

We sustain ConocoPhillips' second and third issues.[33]

### III. CONCLUSION

In light of the foregoing, we conclude that the trial court did not abuse its discretion in permitting Noble to withdraw its admissions 4 and 5. However, we conclude the trial court erred in its denial of ConocoPhillips' partial traditional motions for summary judgment and in its granting of Noble's motion for summary judgment. We therefore reverse the trial court's final judgment, render judgment that Noble owes

---

[33] We need not reach ConocoPhillips' fourth issue. *See* Tex. R. App. P. 47.1.

31

ConocoPhillips a duty of defense and indemnity, and remand for additional proceedings consistent with this opinion.


                                    /s/    Marc W. Brown
                                           Justice


Panel consists of Justices McCally, Brown, and Wise.