**In re SAFETY–KLEEN CORP.,**
**et al., Debtors.**

**No. 00–02303(PJW).**

United States Bankruptcy Court,
D. Delaware.

Aug. 25, 2009.

Michael R. Lastowski, Duane Morris, LLP, Wilmington, DE, Whitton E. Norris, III, Davis, Malm & D'Agostine, Boston, MA, for Clean Harbors Environmental Services, Inc.

David M. Fournier, Pepper Hamilton LLP, Wilmington, DE, for Viacom, Inc.

D.J. Baker, J. Gregory St. Clair, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, Eric M. Davis, Michael W. Yurkewicz, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, DE, for Debtors and Debtors–in–Possession.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This opinion is with respect to the request of Clean Harbors Environmental Services, Inc. ("Clean Harbors") for relief from this Court's order (Doc. # 7281) that approved the rejection of a Stock Purchase Agreement ("SPA") previously assigned in part to Clean Harbors in connection with the bankruptcy cases of Safety–Kleen Corporation and certain of its affiliated entities (collectively, "Debtors"). (Doc. # 7572.) For the reasons stated below, Clean Harbors' request is denied.

## BACKGROUND

On June 9, 2000, Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* Prior to filing for bankruptcy, Safety–Kleen (Aragonite), Inc., a debtor entity ("Safety–Kleen"), owned certain real property located in Coffeyville, Kansas ("Coffeyville Facility") which it purchased from Westinghouse Electric Corporation ("Westinghouse") pursuant to the SPA between, among others, Westinghouse and Rollins Environmental Services, Inc. ("Rollins"), the predecessor to Safety–Kleen. (Doc. # 7572, pp. 1–2.) The SPA was executed on March 7, 1995. (Doc. # 7630, ex.

A.) In pertinent part, § 12 of the SPA provides that, subject to a certain dollar limit, Westinghouse and Rollins each held contingent, unliquidated rights of indemnification against the other with respect to any and all damages arising from pre-and-post-closing environmental matters, including contamination related to the Coffeyville Facility. (*Id.* at ex. A, § 12.) The Coffeyville Facility was the subject of a consent order of the United States Environmental Protection Agency that identified certain groundwater and other contamination at the Coffeyville Facility. Westinghouse later became known as CBS Corporation; Viacom, Inc. ("Viacom") later became CBS Corporation's successor in interest. (Doc. # 7572, pp. 1–2.)

On June 18, 2002, this Court approved the sale of certain of Debtors' assets to Clean Harbors. (Doc. # 4932.) Pursuant to the sale, the indemnity rights as to the environmental matters Safety–Kleen had against Viacom under § 12 of the SPA were assigned to Clean Harbors. (*Id.*; Doc. # 7572, p. 1.)

On February 11, 2003, Debtors filed their First Amended Joint Plan of Reorganization ("Plan"). (Doc. # 6211.) Viacom filed a limited objection to the Plan, asserting that the Plan was not sufficiently clear as to the disposition of the SPA. (Doc. # 6612.) To resolve the objection, Debtors executed a stipulation between Debtors and Viacom that provided that "the SPA will be rejected pursuant to Section 365 of the Bankruptcy Code." That stipulation was incorporated into this Court's order resolving Viacom's objection. (Doc. # 7281.) On August 1, 2003, the Court entered an order confirming the Debtors' Modified First Amended Joint Plan of Reorganization. (Doc. # 7245.)

On October 1, 2003, Clean Harbors filed the instant request for relief from the or-

der resolving Viacom's objection. Clean Harbors argues that the SPA was not an executory contract when Debtors rejected it pursuant to the stipulation with Viacom because it had no continuing value to Debtors, and, further, because Debtors had previously assigned their rights under the SPA, they lacked standing to reject the SPA or alter the indemnity rights assigned to Clean Harbors. Relying on Fed. R.Civ.P. 60, made applicable to this proceeding by Fed. R. Bankr.P. 7060, which allows a court to relieve a party from a final judgment, Clean Harbors requests that the Court enter a second order clarifying that the stipulation order shall have no binding effect on the rights of Clean Harbors vis-a-vis Viacom as provided for by the SPA's indemnity provisions. (Doc. # 7572.) Viacom objects to the relief sought by Clean Harbors, arguing that Clean Harbors' challenge to the executory nature of the SPA is without merit, and that Debtors had standing to reject the SPA. (Doc. # 7630.)

In its objection, Viacom requested that the Court continue the hearing on Clean Harbors' request to a later date so the parties could explore a consensual resolution. (*Id.*) A consensual resolution was not reached and argument on Clean Harbors' request was heard by the Court on August 6, 2009.

## DISCUSSION

*Executory Contracts Under the Bankruptcy Code*

██ Pursuant to 11 U.S.C. § 365(a), subject to the court's approval, any executory contract of the debtor may be assumed or rejected. The term "executory contract" is not defined in the Bankruptcy Code. However, the Third Circuit, along with many other courts of appeals, has adopted the following definition of "executory contract" for the purposes of § 365:

"[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Enter. Energy Corp. v. United States (In re Columbia Gas Sys.),* 50 F.3d 233, 239 (3d Cir.1995) (quoting *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,* 872 F.2d 36, 39 (3d Cir.1989)). Underlying this definition is the recognition that, in the context of bankruptcy, an executory contract should be thought of "as a combination of assets and liabilities to the bankruptcy estate; the performance the nonbankrupt owes the debtor constitutes an asset, and the performance the debtor owes the nonbankrupt is a liability." *Id.* at 238. Economically, the debtor should assume an executory contract when the assets are greater than the liabilities; conversely, the debtor should reject an executory contract when the assets are less than the liabilities. If one party has fully performed its obligations, the contract should not be thought of as executory: if the nonbankrupt party has fully performed, it simply holds a claim against the debtor's estate; if the bankrupt party has fully performed, the performance owed it by the nonbankrupt party is an asset of the estate. Accordingly, a contract is executory if both parties have unperformed obligations that, if not completed, would result in a material breach. Whether an obligation is material is tested at the time of the filing of the bankruptcy petition. *Id.* at 238–40.

██ As to the instant agreement, only the indemnity obligations relating to certain environmental matters contained in § 12 of the SPA remained unperformed at the time of Debtors' filing for bankruptcy. The obligations are clearly material as to both parties: § 12 directs the seller, Via-

com, and the buyer, Safety–Kleen, to mutually indemnify each other against certain environmental matters, including those arising from the contamination related to the Coffeyville Facility. (Doc. # 7630, ex. A.) These indemnification obligations represent continuing duties to indemnify, contingent on the emergence of covered environmental violations. The term for various categories of indemnification ranges from 30 months to 15 years from closing; as the SPA was executed on March 7, 1995, some of these obligations continue.

Courts have ruled that contingent obligations under a contract are sufficient to render a contract executory when the contingent obligations are essential to the contract. *See, e.g., Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043, 1046 (4th Cir.1985), *cert. denied* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986) (holding that a licensor's contingent duty to defend infringement suits was a material obligation); *In re Exide Techs.,* 340 B.R. 222, 234 (Bankr.D.Del.2006) (citing *In re Richmond Metal* ). Thus, I find that at the time of Debtors' filing for bankruptcy, the SPA was an executory contract.

■ Seemingly agreeing that the continuing indemnity obligations contained in § 12 of the SPA were material absent other considerations, Clean Harbors nevertheless argues that the SPA should not be deemed executory because those continuing indemnity obligations are duplicative of obligations that the parties have to each other and third parties pursuant to certain federal and state environmental laws. Thereby, Clean Harbors contends that the SPA was not an executory contract at the time of Debtors' filing for bankruptcy because the indemnity obligations did not constitute a benefit (an asset) or a burden (a liability) to the parties: if a covered environmental issue arose, the parties would be liable to each other and third parties under certain federal and state laws to the exact same degree that the indemnity obligations required them to indemnify each other and third parties. In short, Clean Harbors asserts that it was as if the indemnity obligations were nullities in the context of how contracts are determined to be executory in the context of bankruptcy: "the rejection of the SPA does not relieve either party of such obligations, just as assumption of the SPA would not add any benefit to the Debtor's estate." (Doc. # 7984, p. 6.) As the indemnity provisions of § 12 of the SPA were the only remaining provisions assignable or rejectable, Clean Harbors argues that there was nothing for Debtors to assign or reject that was executory.

■ In support of its argument, Clean Harbors cites *In re Columbia Gas,* which in turn cites *Commercial Union Ins. Co. v. Texscan Corp. (In re Texscan Corp.),* 976 F.2d 1269 (9th Cir.1992). Of relevance, *In re Texscan* holds:

> Even if we assume that Texscan's failure to pay premiums [as provided for by the applicable contract] would otherwise be a material breach, this fact does not relieve CUIC from performing its obligations. The Arizona statute in the present case precludes CUIC from stopping performance, despite Texscan's inability to preform its obligation. Because CUIC would not be excused from performing due to Texscan's default, the contract cannot be considered executory.... Arizona law rejects the distinction between statutory and case law and states that all statutes relating to insurance contracts become part of the contract.

*Id.* at 1273. In an attempt to connect that holding to the § 12 indemnity provisions of the SPA, Clean Harbors points to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601 *et seq.*[1] In pertinent part, CERCLA imposes strict liability on all prior or current owners and operators of hazardous waste facilities for costs incurred in the cleanup of hazardous substances. *Id.* at § 9607(a)(1)-(4). A party on whom liability is imposed under CERCLA may, in turn, bring an action for contribution under § 9613(f) to recover the applicable portion of costs from another liable party. Like the initial imposition of liability, the standard for contribution is strict liability. *See, e.g., Acushnet Co. v. Mohasco Corp.,* 191 F.3d 69, 74–75 (1st Cir.1999) (discussing the broad framework of CERCLA). Clean Harbors contends that these provisions provide substantially the same protection for environmental violations as the § 12 indemnity provisions of the SPA. Thus, according to Clean Harbors, if either party to the SPA were obligated under the § 12 indemnity provisions, CERCLA would require the same obligations.

█ I find that CERCLA's application to the SPA is distinguishable from the interaction of the contract and state law in *In re Texscan.* A majority of courts hold that under CERCLA parties may contractually shift their exact responsibilities as to environmental violations through indemnity provisions, such as the provisions included in the SPA, though they may not

escape their underlying liability, especially as to the Government: "CERCLA does not allow parties to contract out of liability vis-a-vis the Government, but does allow them to do so vis-a-vis other private parties." *Purolator Prods. Corp. v. Allied–Signal, Inc.,* 772 F.Supp. 124, 129 (W.D.N.Y.1991) (listing a string of cases holding same). Thus, private parties may allocate liability amongst themselves through indemnity provisions, that, thereby, necessarily are not duplicative of the rights and obligations provided for by CERCLA. Indeed, the ability to do so itself distinguishes CERCLA's application to private contracts from the application of the state law to private contracts in *In re Texscan:* rather than CERCLA effectively being read into a contract, a contract can amend and rearrange CERCLA. This affords parties a benefit that retains its benefit in the context of whether or not a contract is executory in bankruptcy. In short, though the application of CERCLA may not relieve parties of performing obligations similar to their obligations under a private contract if the contract is breached, breach of the contract does strip the non-breaching party of a bargained-for benefit under the contract.

Likewise, the § 12 indemnity provisions of the SPA provided benefits and burdens to both Viacom and Safety–Kleen that continued at the time of Debtors' filing for bankruptcy even though CERCLA also may have applied to certain environmental matters. Stated succinctly, the indemnity provisions were not nullities. Accordingly,

---

1. Though Clean Harbors states that "the indemnity obligations under the SPA upon which Viacom relies for its 'executory contract' argument are duplicative of identical, non-bankruptcy law obligations imposed under federal and *state* law," Clean Harbors does not identify any applicable state law. (Doc. # 7984, p. 6 (emphasis added).) As the Coffeyville Facility is located in Kansas, Kan-

sas state law as to environmental matters applies. A search of Kansas state statutes does not reveal a state law materially similar to CERCLA such that Clean Harbors' arguments as to CERCLA might equally apply to it. Thus, I will analyze Clean Harbors' argument only as to CERCLA's interaction with the SPA.

**170**

the § 12 indemnity provisions of the SPA were material at the time of the rejection and the SPA was an executory contract.

*Ability to Reject*

 Having determined that the SPA was an executory contract at the time of Debtors' bankruptcy filing, I easily conclude that Debtors had the ability to reject the SPA. In the context of a plan of reorganization, all executory contracts need to be clearly assumed, assigned, or rejected. Debtors had the ability to dispose of the SPA pursuant to 11 U.S.C. § 365. Thus, I cannot enter an order stating that the stipulation order between Viacom and Debtors shall have no binding effect on the rights of Clean Harbors vis-a-vis Viacom. However, I note that by executing the stipulation that rejected the SPA, Safety–Kleen may have given Clean Harbors a claim against it for the loss of the indemnification rights Safety–Kleen seemingly conclusively assigned to Clean Harbors prior to the rejection.

### CONCLUSION

For the reasons stated above, Clean Harbors' request for relief from this Court's order that approved the rejection of the SPA is denied.

### ORDER

For the reasons set forth in the Court's memorandum opinion of this date, Clean Harbors Environmental Services, Inc.'s motion (Doc. # 7572) for relief from judgment is **denied.**