# IN THE SUPREME COURT OF TEXAS

═══════════

No. 15-0502

═══════════

NOBLE ENERGY, INC., PETITIONER,

v.

CONOCOPHILLIPS COMPANY, RESPONDENT

══════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

══════════════════════════════════════════════════

**Argued January 12, 2017**

CHIEF JUSTICE HECHT delivered the opinion of the Court, in which JUSTICE WILLETT, JUSTICE BOYD, JUSTICE DEVINE, and JUSTICE BROWN joined.

JUSTICE JOHNSON filed a dissenting opinion, in which JUSTICE GREEN and JUSTICE GUZMAN joined.

JUSTICE LEHRMANN did not participate in the decision.

The principal question in this case is whether, under the terms of a bankruptcy court order confirming a plan of reorganization and an agreement for sale of the debtor's assets, the purchaser was assigned an undisclosed contractual indemnity obligation of the debtor. We agree with the court of appeals[1] that the answer is yes and therefore affirm.

---

[1] 462 S.W.3d 255 (Tex. App.—Houston [14th Dist.] 2015).

# I

Conoco[2] and Alma swapped oil and gas interests in 1994 under an Exchange Agreement in which each accepted responsibility and indemnified the other for any environmental claims related to the properties received, no matter who caused the injury or when, whether before the swap or after.[3] The agreement provided that the mutual indemnities would "survive . . . the transfer of the Assets".[4] Each party's recorded assignment effectuating the transfers was expressly "made subject to that certain Exchange Agreement dated June 14, 1994, between [Conoco] and Alma", set out the indemnity obligation,[5] and provided that it would be a "covenant[] running with the lands, [l]eases,

---

[2] For simplicity, we refer to respondent ConocoPhillips Co. and its predecessors as "Conoco"; petitioner Noble Energy, Inc. and its predecessors as "Noble"; Alma Energy Corp. as "Alma"; Alma and Noble's asset purchase and sale agreement as "the APA"; Alma's plan of reorganization in bankruptcy as "the Plan"; and the bankruptcy court's order confirming the Plan and the APA as "the Order". We focus on the terms of these three documents and direct the reader to the court of appeals' opinion for a thorough recitation of the facts of the case. *Id.* at 258–263.

[3] Section VII(c) provides: "Assignee assumes full responsibility for, and agrees to release, indemnify, hold harmless and defend Assignor, its agents, officers, and employees from and against all loss, liability, claims, fines, expenses, costs (including attorney's fees and expenses) and causes of action caused by or arising out of any federal, state or local laws, rules, orders and regulations applicable to any waste material or hazardous substances on or included with the Assets or the presence, disposal, release or threatened release of all waste material or hazardous substance from the Assets into the atmosphere or into or upon land or any water course or body of water, including ground water, whether or not attributable to Assignor's activities or the activities of Assignor's officers, employees or agents, or to the activities of third parties (regardless of whether or not Assignor was or is aware of such activities and regardless of any claimed negligence in whole or in part attributable to Assignor) prior to, during or after the period of Assignor's ownership of the Assets. This indemnification and assumption shall apply to liability for voluntary environmental response actions undertaken pursuant either to the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), as such may be amended from time to time, or to any other federal, state or local law."

[4] Exchange Agreement § XII(m).

[5] Conoco's assignment to Alma stated: "[Alma] has agreed and does hereby agree to indemnify and defend Assignor, Assignor's subsidiary and affiliated companies, and its or their respective agents, officers, employees, successors, and assigns, from and against all claims, demands, causes of action, or liability of any nature or kind, including (without limitation) civil fines, penalties, costs of cleanup, or plugging liabilities, brought by any and all persons, entities, or governmental agencies including (without limitation) [Alma's] or [Conoco's] employees, agents, or representatives and also including (without limitation) any private citizens, persons, organizations, and any agency, branch or representative of federal, state or local government, on account of any personal injury, death, damage, destruction, loss of property, or contamination of natural resources (including soil, air, surface water or ground water)

2

and interests" assigned and would "extend to, bind and inure to the benefit of the parties . . . , their heirs, successors and assigns."

In 1999, Alma filed for protection under Chapter 11 of the Bankruptcy Code.[6] Conoco was a party to the bankruptcy proceeding. After a court-approved auction in 2000, Noble and Alma entered into the APA. Noble agreed to buy "[t]he oil and gas leases, mineral interests, and other significant Assets described in Exhibit 'A'",[7] which included the properties Alma had received from Conoco under the Exchange Agreement. Noble also agreed to buy "[a]ll [Alma's] rights and interests in and to all . . . agreements . . . in any way associated with the Assets, including but not limited to, those Material Contracts . . . described on Exhibit 'D'",[8] including "[a]ny agreement of . . . indemnification by [Alma] outside of the ordinary course of business".[9] The Exchange Agreement, though "associated with the Assets", is not listed in either Exhibits A or D, nor was it listed in Alma's disclosures or mentioned in any way in the bankruptcy proceeding. Noble contends it had

---

resulting from or arising out of any liability caused by or connected with the presence, disposal or release of any material of any kind, including, without limitation, asbestos and/or NORM, in, under, or on the Leases at the time of this Assignment, or thereafter caused by acts of [Alma's] employees, representatives, or agents with regard to use of the Leases, wells, or equipment subsequent to this assignment, without regard to whether such liability, injury, death, damage, destruction, loss, or contamination is caused in whole or in part by any claimed negligence, active or passive, on the part of [Conoco] or other indemnified person or entity. To the extent there is any conflict between this Assignment and the Exchange Agreement, the latter Agreement shall prevail."

[6] 11 U.S.C. §§ 1101–1146.

[7] APA § 1.01(a).

[8] APA § 1.01(d).

[9] APA § 3.01(c)(v).

no actual knowledge of the agreement, though it certainly had constructive knowledge from the reference in Conoco's assignment to Alma of the leases Noble was purchasing.[10]

The APA does not list the Exchange Agreement among Noble's "Assumed Liabilities",[11] but section 8.03 states that Noble

> assumes all duties and obligations as the owner of the Assets which accrue or arise from and after [closing], including without limitation the obligation [to] . . . (iii) perform obligations under any executory contracts or unexpired oil and gas leases expressly assumed hereunder, and (iv) to comply with any [consent decrees or laws], and to comply with any [laws] to the extent that any such obligation or liability is attributable to events or periods of time after [closing].[12]

Executory contracts are specially treated under Section 365 of the Bankruptcy Code.[13] As we discuss more fully below, the parties disagree over whether the Exchange Agreement is an executory contract and whether it was expressly assumed. In any event, Noble argues, section 8.03 refers only

---

[10] *See*, *e.g.*, *Cooksey v. Sinder*, 682 S.W.2d 252, 253 (Tex. 1984) (per curiam) ("A purchaser is charged with knowledge of the provisions and contents of recorded instruments."); *Carr v. Oaktree Apartments*, 46 So. 3d 793, 797 (La. Ct. App. 2010) ("Third persons are deemed to have constructive knowledge or notice of the existence and contents of recorded instruments affecting immovable property."); *McCurdy v. Bloom's Inc.*, 907 So. 2d 896, 899 (La. Ct. App. 2005) (same); *Voelkel v. Harrison*, 572 So. 2d 724, 726–727 (La. Ct. App. 1990) (same); *see also* TEX. PROP. CODE § 13.002(1) ("An instrument that is properly recorded in the proper county is . . . notice to all persons of the existence of the instrument . . . ."); LA. CIV. CODE ANN. art. 3338 (2017) ("rights and obligations established or created" by certain written instruments "are without effect as to a third person unless the instrument is registered by recording it in the appropriate mortgage or conveyance records").

[11] APA § 1.04.

[12] APA § 8.03(b).

[13] 11 U.S.C. § 365.

to post-closing obligations.[14] Except as provided by section 8.03, Noble did not "assum[e] any liability of [Alma] or related to the Assets of any kind or description whatsoever."[15]

The APA excused Noble from closing unless "[t]he Plan materially conforms to the terms and conditions of this Agreement, . . . and the Plan and any modifications thereto have been consented to by [Noble] in writing".[16] The Plan authorizes "[a]ll transfers of assets anticipated or provided for under the [APA]".[17] The Plan contains several provisions regarding executory contracts but does not mention the Exchange Agreement. Section 10.8 of the Plan provides that executory contracts not specifically referenced were to be "assumed and assigned to [Noble]" unless rejected at closing.[18] Section 10.9 of the Plan states:

> Exhibit "J" . . . reflects certain agreements, some of which may or may not be binding contracts and may or may not be Executory Contracts, which shall be rejected by [Alma at closing]. By no later than July 28, [Noble] shall notify [Alma] of any . . . executory contracts which are not set forth on Exhibit "J" and which [Noble] elects not to have assumed and assigned to it by [Alma]. All . . . executory contracts which are not (i) rejected or the subject of a motion to reject as of the Confirmation Hearing, (ii) on Exhibit "J" or (iii) on the list provided by [Noble] to [Alma] . . . pursuant to this section, shall be assumed by [Alma] and assigned to [Noble].[19]

Alma did not reject the Exchange Agreement in any way permitted by the Plan.

---

[14] Noble points out that under APA Section 8.04, Alma is responsible for asserted liabilities "arising from any injury or occurrence prior to [closing]". APA § 8.04(b)(ii).

[15] APA § 1.06.

[16] APA § 6.01(g).

[17] Plan § 12.8.

[18] Plan § 10.8.

[19] Plan § 10.9.

The bankruptcy court's Order, issued in 2000, "approved and confirmed in all respects" the

Plan and the APA.[20] Paragraph 15 of the Order provides:

> Except for those contracts and agreements that have either already been assumed or rejected, those Executory Contracts . . . proposed to be assumed and assigned to [Noble] pursuant to the Plan are ordered assumed and assigned to [Noble] . . . . Those Executory Contracts . . . proposed to be rejected pursuant to the Plan . . . are ordered rejected . . . . [Noble has] provided adequate assurance of future performance of all Executory Contracts . . . being assumed and assigned to it.[21]

After the bankruptcy proceeding concluded, Noble acted as if it had assumed the Exchange

Agreement. In 2008, it decommissioned an obsolete tank battery on the property it had received from

Conoco under the agreement. In 2011, Noble agreed to indemnify and defend Conoco under the

Exchange Agreement in two environmental contamination lawsuits, one filed in 2004 and the other

in 2008. But in a third suit, filed in 2010, Noble refused to indemnify Conoco under the Exchange

Agreement.

Conoco sued Noble for breach of the Exchange Agreement to recover the $63 million it paid

to settle the 2010 suit. Both sides moved for summary judgment. The trial court denied Conoco's

motion, granted Noble's, and severed the summary judgment from other claims, making it

appealable. The court of appeals reversed and rendered summary judgment for Conoco, holding that

the Exchange Agreement was an executory contract that was assumed by Alma and assigned to

---

[20] Order ¶ 1.

[21] Order ¶ 15.

Noble in the bankruptcy proceeding.[22] The court remanded the case to the trial court for further proceedings.[23]

We granted Noble's petition for review.[24]

## II

Because several of the provisions of the APA, Plan, and Order that we must interpret apply to executory contracts, we consider first whether the Exchange Agreement qualifies. Section 365 of the Bankruptcy Code authorizes a bankruptcy trustee to assume or reject executory contracts and prescribes how that authority is to be exercised.[25] Although the statute does not include a definition, the United States Supreme Court has stated that "Congress intended the term to mean a contract 'on which performance is due to some extent on both sides.'"[26] The Fifth Circuit has phrased the test this way: "an agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party."[27] A debtor-in-bankruptcy's executory contracts present special

---

[22] 462 S.W.3d 255, 259, 275–276 (Tex. App.—Houston [14th Dist.] 2015).

[23] *Id.*

[24] 59 Tex. Sup. Ct. J. 1593 (Sept. 2, 2016).

[25] 11 U.S.C. § 365.

[26] *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984) (citation omitted).

[27] *Phoenix Expl., Inc. v. Yaquinto (In re Murexco Petroleum, Inc.)*, 15 F.3d 60, 62–63 & n.8 (5th Cir. 1994) (citing Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 MINN. L. REV. 439, 458–462 (1973); Vern Countryman, *Executory Contracts in Bankruptcy: Part II*, 57 MINN. L. REV. 479 (1974)).

issues in handling the estate. As the Third Circuit has explained:

> Executory contracts in bankruptcy are best recognized as a combination of assets and liabilities to the bankruptcy estate; the performance the nonbankrupt owes the debtor constitutes an asset, and the performance the debtor owes the nonbankrupt is a liability. The debtor (or trustee that has stepped into the debtor's shoes) may elect to assume an executory contract, in which case § 365 mandates that the debtor accept the liability with the asset and fully perform his end of the bargain.[28]

The Exchange Agreement did two things: it provided for a swap of assets between Conoco and Alma, and it mutually obligated them to indemnify each other for all environmental contamination claims related to the properties received. The indemnity obligation covered all claims of contamination, regardless of when it occurred—whether before or after the agreement—and who was at fault—even if the indemnitee. The property transfers were completed immediately, but the mutual indemnity obligations survived. At the time Alma filed for bankruptcy protection, either party could summon the other to perform on its indemnity. Courts have uniformly held that contracts imposing ongoing indemnity obligations contingent on future events are executory.[29] Noble cites no case to the contrary, and we have found none.

Rather, Noble argues that the essence of the Exchange Agreement was the property swap, that the mutual indemnities were tangential, that the parties substantially performed the agreement

---

[28] *Enter. Energy Corp. v. United States (In re Columbia Gas Sys., Inc.)*, 50 F.3d 233, 238 (3d Cir. 1995).

[29] *See Otto Preminger Films, Ltd. v. Qintex Entm't, Inc. (In re Qintex Entm't, Inc.)*, 950 F.2d 1492, 1496 (9th Cir. 1991); *Lubrizol Enters. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985); *In re Abitibibowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009); *In re Safety-Kleen Corp.*, 410 B.R. 164, 166–168 (Bankr. D. Del. 2009); *Philip Servs. Corp. v. Luntz (In re Philip Servs. (Del.) Inc.)*, 284 B.R. 541, 547–550 (Bankr. D. Del. 2002); *Waldschmidt v. Metro. Lincoln-Mercury, Inc. (In re Preston)*, 53 B.R. 589, 591 (Bankr. M.D. Tenn. 1985); *Hassett v. Revlon, Inc. (In re O.P.M. Leasing Servs., Inc.)*, 23 B.R. 104, 117 (Bankr. S.D.N.Y. 1982).

when the property interests were assigned, and that the remaining indemnity obligations, contingent on future events, did not make the agreement executory. Noble cites two cases in support of its argument. One, *In re Interstate Bakeries Corp.*, involved the sale of a business and its assets along with a license agreement authorizing the buyer's perpetual, exclusive, and royalty-free use of the seller's trademark.[30] The court concluded that the "essence of the agreement" was the sale of the business, not merely the licensing of the seller's trademark, especially when it concerned only one of the assets sold.[31] Therefore, the court concluded, the license agreement was not executory.[32] The other case, *In re Exide Technologies*, similarly involved the sale of a business accompanied by a trademark license agreement obligating the seller to maintain quality standards and refrain from using the trademark.[33] The court concluded that the essence of the agreement was the sale of the business, not the trademark license, and therefore the license agreement was not executory.[34] As another court has observed, licensing agreements are "not . . . universally considered executory contracts."[35] Rather, a court must "examine the unperformed duties and obligations of each party to

---

[30] *Lewis Bros. Bakeries, Inc. v. Interstate Brands Corp. (In re Interstate Bakeries Corp.)*, 751 F.3d 955, 961 (8th Cir. 2014).

[31] *Id.*

[32] *Id.*

[33] 607 F.3d 957, 963 (3d Cir. 2010).

[34] *Id.* at 964.

[35] *Qintex Entm't, Inc.*, 950 F.2d at 1495.

determine the status of an agreement."[36] *Exide Technologies* and *Interstate Bakeries* concluded that the trademark licensing obligations were "minor" in the context of the entire agreement.[37]

The mutual indemnity obligations under the Exchange Agreement were in no sense minor or unrelated to the property swap. The indemnities were an important factor in the value of the properties transferred. With substantial performance, "the defects in performance do not prevent the parties from accomplishing the purpose of the contract."[38] The stated purpose of the Exchange Agreement was to transfer responsibility for the swapped parties as well as title. Any failure to perform the mutual indemnity obligations would deny the indemnitee the benefit of its bargain. When Alma filed for bankruptcy, the performance it owed Conoco under the Exchange Agreement was a liability, and the performance Conoco owed it was an asset. We agree with the court of appeals that the Exchange Agreement was an executory contract.

## III

As for whether Alma assumed the Exchange Agreement and assigned it to Noble, the APA is less than perfectly clear. Noble agreed to buy Alma's assets listed in Exhibit "A".[39] The property interests Alma had acquired from Conoco were in that list.[40] Noble also agreed to buy "[a]ll [Alma's]

---

[36] *Id.*

[37] *Exide*, 607 F.3d at 964; *Lewis Bros. Bakeries, Inc. v. Interstate Brands Corp. (In re Interstate Bakeries Corp.)*, 751 F.3d 955, 964 (8th Cir. 2014) (obligations under the license were relatively minor in the context of the agreement to sell operations and assets in certain territories) .

[38] *Matador Drilling Co. v. Post*, 662 F.2d 1190, 1195 (5th Cir. 1981).

[39] APA § 1.01(a).

[40] APA Ex. A.

rights and interests in and to all . . . agreements . . . in any way associated with" the purchased assets, "including but not limited to, those Material Contracts . . . described on Exhibit 'D'".[41] Although the Exchange Agreement was not listed with such agreements in Exhibit "D" and does not fall within the general description of "Material Contracts", the interests Noble purchased were explicitly "not limited to" those listed in Exhibit "D" or described as "Material Contracts".[42] The Exchange Agreement was certainly associated with assets Noble bought. Conoco's assignment of leases to Alma was expressly subject to the Exchange Agreement and set out its indemnity provisions in detail. The Exchange Agreement was thus among the interests Noble purchased.

Alma's indemnity obligation under the Exchange Agreement was a liability, but the agreement was not included in the APA's list of Noble's "Assumed Liabilities".[43] Noble argues that it bought only the benefits of the Exchange Agreement and not the liabilities. Conoco responds that Section 365 of the Bankruptcy Code requires that executory contracts like the Exchange Agreement be purchased *cum onere*—with burdens as well as benefits. We need not resolve this dispute because Noble's argument is contrary to the APA.

Under Section 8.03 of the APA, Noble agreed to

assume[] all duties and obligations as the owner of the Assets which accrue or arise from and after [closing], including without limitation the obligation [to] . . . (iii) perform obligations under any executory contracts or unexpired oil and gas leases expressly assumed hereunder, and (iv) to comply with any [consent decrees or laws],

---

[41] APA § 1.01(d).

[42] APA § 1.01(d).

[43] APA § 1.04.

11

and to comply with any [laws] to the extent that any such obligation or liability is attributable to events or periods of time after [closing].[44]

Noble argues that its obligation to indemnify Conoco for the claims in the 2010 lawsuit accrued or arose when the obligation was created by the Exchange Agreement years before the bankruptcy proceeding. It cites a Third Circuit case, *In re Allegheny Health, Education and Research Foundation*, in which the purchaser of assets in bankruptcy—a number of hospitals—agreed to assume liability only for obligations arising after closing of the transaction.[45] The court held that hospital employees' accrued sick leave was a pre-closing obligation because "the collective bargaining agreements show[ed] that once the employees had accumulated sick leave, they had a right to the leave, albeit a right contingent on future illness, injury or retirement."[46] "A contingent obligation," the court wrote, "is, nonetheless, an obligation."[47] Likewise, Noble argues, the indemnity obligation under the Exchange Agreement, though contingent on a claim being made against Conoco, was nonetheless an obligation. But *Allegheny* held only that the obligation to pay employee benefits arose when employees had earned them, not when the collective bargaining agreements were executed. *Allegheny* does not support Noble's argument that a contingent obligation arises when it is created.

---

[44] APA § 8.03(b).

[45] 383 F.3d 169, 172 (3d Cir. 2004).

[46] *Id.* at 178.

[47] *Id.*

We have held that "a claim based on a contract that provides indemnification from liability does not accrue until the indemnitee's liability becomes fixed and certain."[48] Conoco's liability did not become fixed and certain until it settled the lawsuit in 2011 for $63 million. Noble also argues that the indemnity claim against Conoco in the 2010 suit was for contamination that occurred years before the Exchange Agreement was executed and thus not attributable to events following closing of the APA. But again, the indemnity obligation is attributable to the event that triggered it—the settlement of the 2010 suit, not the execution of the Exchange Agreement. The obligation accrued, arose, and was attributable to events that occurred long after the closing of the APA. Thus, it was assumed by Noble under Section 8.03 of the APA.

The Plan and Order reinforce this interpretation of the APA. Section 10.8 of the Plan provides that executory contracts not specifically referenced were to be "assumed and assigned to [Noble]" unless rejected at closing.[49] Section 10.9 required Noble to notify Alma by a certain date of its election not to have specific executory contracts assumed and assigned to it. "All . . . executory contracts . . . not . . . rejected . . . pursuant to this section," Section 10.9 states, "shall be assumed by [Alma] and assigned to [Noble]."[50] The Exchange Agreement was not specifically referenced in the Plan and was never rejected in any way permitted by the Plan and thus was assumed by Alma and assigned to Noble. Paragraph 15 of the bankruptcy court's Order clearly stated: "those Executory

---

[48] *Ingersoll-Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 205 (Tex. 1999).

[49] Plan § 10.8.

[50] Plan § 10.9.

Contracts . . . proposed to be assumed and assigned to [Noble] pursuant to the Plan are ordered assumed and assigned to [Noble]".[51]

The APA did not require Noble to close unless "[t]he Plan materially conforms to the terms and conditions of this Agreement".[52] The fact that Noble elected to close indicates that in its view, at least, the assignment of executory contracts under the Plan materially conformed to the APA. And Noble's post-bankruptcy conduct was consistent with that view. Noble removed an unused facility as required by the Exchange Agreement, and even indemnified Conoco from liability on two other contamination claims.[53]

Noble argues that the Exchange Agreement could not be assumed and assigned under the general, catchall assumed-unless-rejected provisions of Sections 10.8 and 10.9 of the Plan and Paragraph 15 of the Order, citing the Fifth Circuit's opinion in *In re O'Connor*.[54] O'Connor, the debtor in a Chapter 11 proceeding, was a party to a partnership agreement that the bankruptcy court held, and the district court assumed, was an executory contract.[55] The reorganization plan provided that certain executory contracts—not the partnership agreement—"are hereby rejected" while all

---

[51] Order ¶ 15.

[52] APA § 6.01(g).

[53] The dissent misses the point, which is not that Noble's acceptance of responsibility under the Exchange Act created indemnity obligations that did not exist, but that Noble initially interpreted the APA, Plan, and Order as Conoco does.

[54] *Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 401 (5th Cir. 2001).

[55] *Id.* at 396, 400.

others not previously rejected—which could have included the agreement—"will be assumed."[56] Neither the debtor's disclosures nor the plan made any specific reference to the agreement.[57] After the plan was confirmed, the estate trustee claimed to be entitled to exercise the debtor's rights under the partnership agreement.[58] The court of appeals held that the partnership agreement was not assumable under Section 365(c)(1) of the Bankruptcy Code and Louisiana law, and therefore the agreement passed through the bankruptcy unaffected to the pre-bankruptcy debtor rather than to the reorganized debtor, a liquidating trust.[59] The bankruptcy court had not addressed that issue but had concluded that the partnership agreement had neither been assumed nor rejected because "will be assumed", especially in contrast with "are hereby rejected", indicated that something more than plan confirmation was required for assumption.[60] The court of appeals deferred to the bankruptcy court's interpretations of the plan, noting that it was "consistent with the conclusions by other courts that an executory contract may *not* be assumed either by implication or through the use of boilerplate plan language."[61]

Thus, the actual holdings in *O'Connor* were that the partnership agreement was not an assumable executory contract and that the bankruptcy court's interpretation of the plan's literal

---

[56] *Id.* at 395, 401.

[57] *Id.* at 401.

[58] *Id.* at 396.

[59] *Id.* at 401–402.

[60] *Id.* at 401.

[61] *Id.*

language was entitled to deference. The Fifth Circuit's labeling of the language at issue as "boilerplate" was no more than an aside. The court in *In re Greater Southeast Community Hospital Corp. I* characterized it as "dicta upon an alternative ground" for the court's decision.[62] The Chapter 11 plan in *Greater Southeast* provided that executory contracts not identified within a specified time "will be deemed assumed", subject to provisions relating to cure.[63] Distinguishing *O'Connor*, the court gave effect to the provision:

> The plan here expressly assumed the executory contracts at issue, and did not assume them by implication. Moreover, [there is no contention] that the plan used ineffectual boilerplate language. By explicitly deeming the executory contracts at issue assumed (subject to a retained right of rejection if cure amounts proved unacceptable) and setting forth provisions for fixing the cure amounts, and deadlines for paying the same, the confirmed plan here can hardly be said to have employed "boilerplate language" (whatever that term means).[64]

*Greater Southeast* also distinguished *In re Parkwood Realty Corp.*[65] There, after the debtor in a Chapter 11 proceeding had rejected several executory contracts, the plan provided that "[a]ll other executory contracts . . . which have not been previously rejected shall be deemed rejected on [the plan's effective date]."[66] The debtor did not disclose or mention a shareholders agreement to which it was a party, or give its co-party, Parkside Lakes, notice of the bankruptcy proceeding.[67]

---

[62] *Alberts v. Humana Health Plan, Inc. (In re Greater Southeast Cmty. Hosp. Corp. I)*, 327 B.R. 26, 34 (Bankr. D.D.C. 2005).

[63] *Id.* at 29 n.3.

[64] *Id.* at 35.

[65] 157 B.R. 687 (Bankr. W.D. Wash. 1993).

[66] *Id.* at 689.

[67] *Id.* at 689, 691.

Repeatedly referring to the plan language as boilerplate, the bankruptcy court refused to allow the debtor to avoid its obligations under the agreement for two reasons.[68] First: "rejection [of an executory contract] is specifically subject to § 365 and as such requires 'actual consideration by the Court.' . . . [T]o approve the rejection of an unidentified contract results in purely fictitious compliance with the Code."[69]

> Second, and perhaps more important, are the due process implications inherent in the debtor's position. Parkside Lakes has never had notice that the debtor viewed the Shareholders Agreement as an executory contract, much less that it was one of those being rejected. Further, Parkside Lakes did not have notice of the hearing on confirmation. Indeed the executory contract argument was only raised defensively, after confirmation, when it was too late to file a claim for damages. This is insufficient.[70]

According to the court in *Greater Southeast*, "*Parkwood Realty* turned on due process concerns, and only secondarily questioned the effectiveness of a plan provision deeming executory contracts

---

[68] *Id.* at 690–691.

[69] *Id.* at 691 (internal citation omitted). The dissent argues that the court in Alma's bankruptcy proceeding could not have given actual consideration to approval of Alma's assumption and assignment of the Exchange Agreement when it did not know the agreement existed. *Post* at ___. But Section 365 does not impose an obligation on the court to conduct an independent investigation. Conoco was a party to the proceeding and raised no objection. And Noble had at least constructive notice of the Executive Agreement in its chain of title and raised no objection. There is nothing before us to indicate that Alma's assumption and assignment to Noble were of any interest to creditors or others. The bankruptcy court's approval of the plan was perfectly understandable.

[70] *Id.*

17

rejected."[71] Those concerns were for the debtor's co-party who, unlike Noble, had no notice of the proceedings; Noble, in contrast, was thoroughly involved in Alma's bankruptcy.

Two cases help summarize the law on assumption-rejection catchall provisions in Chapter 11 plans. The plan in *In re Amerivision Communications, Inc.* provided that "the Debtor shall be deemed to have rejected each Executory Contract to which it is a party, unless such contract . . . was previously assumed by the Debtor" or other specified conditions were met, and "[t]he Confirmation Order will provide for the rejection of those Executory Contracts not assumed or assigned previously or as provided herein."[72] The debtor listed a production contract as one of its executory contracts, and the co-party, Dataprose, knew of the bankruptcy proceeding, but the production contract was not listed as one to be rejected.[73] After the plan was confirmed, Dataprose objected to the rejection of the production contract.[74] The court upheld the language of the plan and confirmation order:

> In the case of *In re Victory Markets, Inc.*, 221 B.R. 298 (2d Cir. BAP 1998), the Chapter 11 reorganization plan contained a provision that explicitly rejected all executory contracts not listed on an assumption schedule attached to the plan. A

---

[71] *Greater Southeast*, 327 B.R. at 35. Thus, neither *O'Connor* nor *Parkwood* supports the dissent's broad assertion that "bankruptcy courts have consistently concluded that the assumption or rejection of an executory contract under section 365 cannot be approved in bankruptcy if the contract has not been disclosed." *Post* at ___. The only other case it cites in support is *In re Golden Triangle Film Labs, Inc.*, 176 B.R. 608, 610 (Bankr. M.D. Fla. 1994). There, as the dissent notes, the plan provided that "all executory contracts and unexpired leases of the Debtor shall be assumed . . . and . . . assigned to [the] reorganized [debtor] . . . except any executory contracts and unexpired leases that are subject of separate motions to reject file[d] pursuant to [Section] 365". *Id.* at 609. The court held that because no motion to reject the nonresidential lease at issue had been filed, and the plan and Section 365(d)(4) both required such a motion, the lease had not been rejected. *Id. Golden Triangle* is contrary to the dissent's view that the plain language of a bankruptcy plan and order, though general, cannot control.

[72] *Dataprose, Inc. v. Amerivision Commc'ns, Inc. (In re Amerivision Commc'ns, Inc.)*, 349 B.R. 718, 721 (B.A.P. 10th Cir. 2006).

[73] *Id.*

[74] *Id.* at 721–722.

majority of the court ruled that the absence of an executory contract from the schedule effected a rejection of the contract at issue because the plan language was clear and the contract was not explicitly assumed. *Id.* at 304–05.

We agree with the Court of Appeals for the Fifth Circuit that specific notice of the plan proponent's intent is required through the confirmation process or by separate motion. [*In re Nat'l Gypsum Co.*, 208 F.3d 498, 513 (5th Cir. 2000).] However, the question in this case is not only whether the use of boilerplate language is acceptable (assuming this is boilerplate language), but also whether the notice under the circumstances was adequate.

Under the facts of this case, the Court concludes that the plan language provided adequate notice of the intended rejection. The Court does not invalidate boilerplate language per se. The validity of any language depends upon notice and clarity and the overall information provided to the parties in interest. Here, the plan provision put any party to an executory contract on notice that absent specific assumption, the contract was rejected.[75]

The second case, *Tenucp Property, LLC v. Riley (In re GCP CT School Acquisition, LLC)*,[76]

involved a Chapter 11 debtor tenant's rejection of a lease. The court upheld the rejection:

Another issue that has surfaced in case law is when a party uses so-called boilerplate language to assume or reject. Some courts have held that "boilerplate" language in a chapter 11 plan may provide adequate notice of the proposed rejection of an executory contract. *See, e.g., Dataprose, Inc. v. Amerivision Commc'ns, Inc. (In re Amerivision Commc'ns, Inc.),* 349 B.R. 718 (10th Cir. BAP 2006). . . .

The U.S. Bankruptcy Appellate Panel of the Second Circuit reached a similar conclusion in *Charter Asset Corp. v. Victory Mkts., Inc. (In re Victory Mkts., Inc.),* 221 B.R. 298 (2d Cir. BAP 1998). . . .

Other courts, however, have concluded that general boilerplate language does not automatically effect assumption or rejection, holding that the assumption or rejection will only be effective if the bankruptcy court actually considers the

---

[75] *Id.* at 723.

[76] 429 B.R. 817 (B.A.P. 1st Cir. 2010).

provision at issue.[77] . . .

> Ultimately, the issue is one of notice. As the *Amerivision* panel noted, the question is not only whether the language contained within the plan or motion is sufficiently explicit, but whether the notice (service of the relevant documents) under the circumstances was adequate. Thus, "the validity of any language depends upon notice and clarity and the overall information provided to the parties in interest."[78]

We would be reluctant to disregard any language in a court order as "boilerplate", but that label certainly does not fit here. The Order confirmed the APA and the Plan that used both exclusive and non-exclusive language throughout, and we must assume the choices were intentional. As Conoco observes, the Plan could have stated, as reorganization plans often do, that all executory contracts not formally assumed and assigned by a certain date would be rejected. Either way, the language is adjudicatory, not boilerplate.[79]

Noble complains that the Exchange Agreement was not listed in Alma's disclosures or mentioned in any way in the bankruptcy proceeding and asserts that it was unaware of the agreement before closing on the APA.[80] We have noted that the Exchange Agreement was specifically

---

[77] *Id.* at 827–828 & n.14 (citing *In re Cole*, 189 B.R. 40, 46 (Bankr. S.D.N.Y. 1995) (refusing to give effect to boilerplate assumption provision in plan); *Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 401 (5th Cir. 2001); *In re Parkwood Realty Corp.*, 157 B.R. 687, 690–691 (Bankr. W.D. Wash. 1993); *Cont'l Country Club, Inc. v. Burr (In re Cont'l Country Club, Inc.)*, 114 B.R. 763, 766–767 (Bankr. M.D. Fla. 1990)).

[78] 429 B.R. at 827–829 (quoting *Amerivision*, 349 B.R. at 723).

[79] *See, e.g., Amerivision*, 349 B.R. at 721; *Charter Asset Corp. v. Victory Mkts., Inc. (In re Victory Mkts., Inc.)*, 221 B.R. 298, 303 (B.A.P. 2d Cir. 1998) (holding that plain language, "unexpired leases . . . not previously assumed and assigned are hereby specifically rejected", should be given effect).

[80] The dissent cites three cases "that have addressed a bankruptcy debtor's failure to follow the specific requirements of section 365 when attempting to dispose of an executory contract": *American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 78 (3d Cir. 1999); *In re Allegheny Health, Education and Research Foundation*, 383 F.3d 169, 172 (3d Cir. 2004); and *Gray v. Western Environmental Services & Testing, Inc. (In re Dehon, Inc.)*, 352 B.R. 546, 558 (Bankr. D. Mass. 2006). *Post* at ___–___. In all three, the court gave effect to the debtor's intent. Thus, the dissent's reliance on these cases is perplexing.

referenced in Conoco's assignment to Alma of some of the interests Noble acquired, and that the assignment was expressly subject to the Exchange Agreement. Thus, Noble had at least constructive notice of the Exchange Agreement. Noble also complains that Conoco was a party to the bankruptcy proceeding and could have disclosed the Exchange Agreement but never did. Noble argues that full disclosure in bankruptcy proceedings is essential, and that if a buyer of a debtor's assets risks being saddled with undisclosed liabilities, asset sales, important in estate reorganizations, will be less attractive. While we take Noble's point, the issue before us is not whether the bankruptcy proceedings were conducted as they should have been. We decide what the APA, the Plan, and the Order mean, and whether they are effective under Section 365. As critical as disclosure in bankruptcy proceedings may be, we think it more critical that parties to bankruptcy proceedings and others have confidence that reorganization plans and court orders will be interpreted and enforced according to their plain terms.

The dissent argues that today's decision is "manifestly inequitable."[81] We disagree. Noble knew from the plain terms of the APA, the Plan, and the Order that it could be assigned executory contracts not specifically listed. It had at least constructive knowledge of the Exchange Agreement in its own chain of title. Years after the bankruptcy proceeding was over, it repeatedly honored the indemnity obligation imposed by the agreement. And had Noble needed indemnification from Conoco, no doubt it would have sought the benefits promised it by the Exchange Agreement.[82] But

---

[81] *Post* at ___.

[82] After Alma's bankruptcy, Noble's predecessor sold the assets obtained under the Exchange Agreement.

inequitable or not, we think the result we reach is compelled by the governing documents and the law.

We thus conclude that by the APA, the Plan, and the Order, the Exchange Agreement was assumed by Alma and assigned to Noble.

*    *    *    *    *

The judgment of the court of appeals is, accordingly,

*Affirmed*.

_____

Nathan L. Hecht
Chief Justice

Opinion delivered: June 23, 2017

22